REDACTED

### AFFIDAVIT OF SPECIAL AGENT LINDSAY WALFORD IN SUPPORT OF CRIMINAL COMPLAINT, ARREST WARRANTS, SEIZURE WARRANTS, AND VERIFIED COMPLAINT FOR FORFEITURE IN REM

I, Lindsay Walford, being first duly sworn, state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the U.S. Department of Health and Human Services, Office of Inspector General ("HHS-OIG").  I am currently assigned to the Boston Regional Office and am assigned cases that cover the state of Rhode Island.  I have been employed as a Special Agent with HHS-OIG for over twenty-one years.  I have a bachelor's degree in Criminal Justice from Northeastern University in Boston, Massachusetts.  I have received extensive training at the Federal Law Enforcement Training Center in Glynco, Georgia.

2.      As an HHS-OIG Special Agent, I am responsible for investigating allegations of fraud against the various programs under HHS's jurisdiction, including the Medicare and Medicaid programs.  I have participated in numerous investigations involving those programs and have interviewed witnesses, conducted surveillance, and reviewed claims data, medical records, and other business records.  I have also assisted with the execution of numerous search and arrest warrants.  I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. §2510(7), in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses.

3.      *Criminal Complaint & Arrest Warrants.*  I make this affidavit in support of an application for a criminal complaint against Recovery Connection Centers of America, Inc. ("RCCA"); Michael Brier ("Brier"), owner and operator of RCCA; and Mi Ok Bruining ("Bruining") for violations 18 U.S.C. § 1347 (Health Care Fraud), and also against Michael Brier for violations of 18 U.S.C. § 1028A (Aggravated Identity Theft), 18 U.S.C. § 1519 (Falsification

of Records in Federal Investigation), and 18 U.S.C. §§ 1956 and 1957 (Money Laundering) (collectively, the "TARGET OFFENSES"). Arrest warrants for Brier and Bruining are also sought.

      4.    *Seizure Warrants and Specified Real Property.* I make this affidavit in support of applications for seizure warrants for the following thirteen bank accounts (collectively the "SUBJECT FUNDS") and two vehicles (collectively the "SUBJECT VEHICLES") and in support of a verified complaint in rem as to real property, specifically two buildings:

      a.  all funds in Target Account 1, the Bank of America ("BOA") account ending in 0760 that was opened on 4/24/2018 by Brier and Dr. #2 in the name of "Recovery Connection Centers of America,"

      b.  all funds in Target Account 2, the BOA account ending in 2420 that was opened on 11/13/2017 by Brier,

      c.  all funds in Target Account 3, the BOA account ending in 6018 that was opened on 9/27/2019 by Brier and Individual A in the name of Brier and Individual A,

      d.  all funds in Target Account 4, the BOA account ending in 7190 that was opened on 4/29/2018 by Brier and Dr. #2 in the name of "Barrington Urgent Care, PC,"

      e.  all funds in Target Account 5, the Village Bank savings account ending in 7114 that was opened on 9/18/2007 by Brier Relation #1,

      f.  all funds in Target Account 6, the Village Bank savings account ending in 6277 that was opened on 9/18/2020 by Brier Relation #1,

      g.  all funds in Target Account 7, the BOA account ending in 3135 that was opened on 12/29/2021 by Brier in the name of "Recovery Connection Management Services,"

      h.  all funds in Target Account 8, the BOA account ending in 3148 that was opened on 12/29/2021 by Brier in the name of "Recovery Connection Management Services,"

      i.  all funds in Target Account 9, the BOA account ending in 2433 that was opened on 11/13/2017 by Brier,

      j.  all funds in Target Account 10, the Vanguard SEP IRA brokerage account ending in 7970 that was opened on 1/11/2021 by Brier,

k.  all funds in Target Account 11, the Vanguard Roth IRA brokerage account ending in 4187 that was opened on 6/22/2020 by Michael Brier,

l.  all funds in Target Account 12, the TD Ameritrade account ending in 5118 that was opened on 11/20/2003 by Brier Relation #1,

m.  all funds associated with the participant Michael Brier in Target Account 13, the John Hancock contract account ending in 0593 that was opened 5/15/19 by Michael Brier,

n.  Target Vehicle 1, which is the 2019 Lexus RX350 sedan with Massachusetts license plate number 3MRM51 and VIN# 2T2BZMCA5KC199884 and which is registered to Brier Relation #1 of 29 Kenilworth Street, Newton, MA 02458, and

o.  Target Vehicle 2, which is the 2020 Mercedes Benz GLE350 sedan with Massachusetts license plate number 2MMF74 and VIN # 4JGFB4KB0LA070862 and which is registered to Brier Relation #1 of 29 Kenilworth Street, Newton, MA 02458,

p.  Target Property 1, which is the building, grounds, and associated curtilage located at 381 Wickenden Street, Providence, Rhode Island 02903, and

q.  Target Property 2, which is the building, grounds, and associated curtilage located at 29 Kenilworth Street, Newton, MA 02458.

The thirteen accounts are described further in Attachment A-1 (Bank of America accounts), A-2 (Village Bank accounts), A-3 (Vanguard accounts), A-4 (TD Ameritrade account), A-5 (John Hancock contract account), A-6 (vehicles), and A-7 (real properties).

5.  The investigation has uncovered evidence, including as set forth below, of the offenses listed above, among others, including through the following means:

a.  **Fraudulent Application for Medicare Provider Status:**
RCCA and Brier caused a fraudulent application to be submitted to Medicare which, among other things, misrepresented and concealed the role that Brier was playing in the business and failed to disclose his relevant criminal record as required.

b.  **False Billing for 45 Minute Counseling Sessions**: RCCA, Brier and Bruining and others fraudulently caused false claims to be submitted for psychotherapy and counseling services that did not occur for the length of time billed, including days on which so many claims were submitted for the same therapist that the billings would be impossible to achieve in a single day.

3

      **c.** **Unlicensed Practice of Medicine and Submitting Fraudulent Prescriptions**: Brier purported to practice medicine and wrote and caused to be filled prescriptions using the names and prescriber information, including Drug Enforcement Administration ("DEA") numbers, of doctors without their permission.[1]

6.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of the TARGET OFFENSES have been committed by Brier, Bruining, and the businesses of RCCA.

7.     I base this affidavit upon my personal knowledge, upon information and documents provided to me by other investigators assigned to this investigation, and upon information and documents provided by third parties. Because this affidavit is submitted for the limited purpose of securing a complaint, arrest warrants, and seizure warrants and supporting a verified complaint in rem, I have not included each and every fact that has been revealed to me through the course of this investigation. Instead, I have set forth only the facts that I believe are necessary to evaluate the legal basis for the issuance of the requested warrants and initiation of the civil forfeiture action as to the specified real properties.

8.     *Seizure for Parallel Civil and Criminal Forfeiture.* Pursuant to 21 U.S.C. § 853(f) and 18 U.S.C. §§ 981(b) and 982(b)(1), I request that seizure warrants authorizing the seizures of the SUBJECT FUNDS and SUBJECT VEHICLES be issued by this Court. Under 18 U.S.C. § 981(b)(3), "notwithstanding the provisions of rule 41(a) of the Federal rules of Criminal Procedure, a seizure warrant may be issued pursuant to this subsection by a judicial officer in any district in which a forfeiture against the property may be filed." Further, pursuant to 21

---

[1] A DEA number is a unique identifier assigned to a health care provider that allows them to write prescriptions for controlled substances.

U.S.C. § 853(f), the Government may request a seizure warrant for property subject to forfeiture and "[i]f the court determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that a [restraining order or injunction] order under subsection (e) may not be sufficient to assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property." Finally, 28 U.S.C. § 853(l) provides, "The district courts of the United States shall have jurisdiction to enter orders as provided in this section without regard to the location of any property which may be subject to forfeiture under this section, or which has been ordered forfeited under this section."

9.      For the reasons set forth below, there is probable cause to believe that funds in each of the aforementioned accounts were derived from proceeds traceable to violations of specified unlawful activities as defined in 18 U.S.C. §§ 1956(c)(7)(F), specifically health care fraud under 18 U.S.C. § 1347.  As such, the traceable portion of the SUBJECT FUNDS is subject to seizure and forfeiture under 18 U.S.C. §§ 981(a)(1)(C), 982(a)(1), 982(a)(7), and 984 and 28 U.S.C. § 2461.  There is also probable cause to believe that the entirety of the SUBJECT FUNDS and the SUBJECT VEHICLES were involved in money laundering activity in violation of 18 U.S.C. §§ 1956 and 1957 and as such are subject to seizure and forfeiture under 18 U.S.C. §§ 981(a)(1)(A) and 982(a)(1).

10.     *Declaration Concerning Verified Complaint.*  Pursuant to 28 U.S.C. §1746, I declare, certify, verify, and state under penalty of perjury that the foregoing is true and correct, to the best of my knowledge.

11.     *Jurisdiction.*  This Court has jurisdiction to issue the requested warrants because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a),

(b)(1)(A), and (c)(1)(A). Specifically, the Court is a "district court of the United States . . . that – has jurisdiction over the offense[s] being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE THAT FEDERAL CRIMES WERE SUBMITTED

### I.  BACKGROUND

#### A.  Medicare and Medicaid

12.  The Medicare program ("Medicare") is a federal health care program providing benefits to persons who are over the age of 65 or disabled. The United States Department of Health and Human Services ("HHS"), through its agency the Centers for Medicare and Medicaid Services ("CMS"), administers Medicare. Medicare is a "health care benefit program" as defined by 18 U.S.C. § 24(b).

13.  To enroll in Medicare, all providers are required to submit a Medicare enrollment application to CMS. In submitting the Medicare application, health care providers certify that they understand and will abide by the federal laws and regulations governing their participation in Medicare. This is true whether the application is for an individual or a business. When Medicare approves a provider's application, Medicare issues the provider a unique provider number that is associated with the provider's individual National Provider Identifier ("NPI") number. Upon enrollment, Medicare relies on the provider's assigned number or his/her NPI to identify the rendering provider of the service in claims submitted for payment, as well as a unique provider number or NPI of the entity under which the rendered service has been provided.

14.  CMS contracts with SafeGuard Services, LLC ("SGS") to perform all of the enrollment activities for providers in Massachusetts and with National Government Services ("NGS") for enrollment activities in Rhode Island.

15.     A Medicare provider is able to electronically file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim is required to set forth, among other things, the beneficiary's name and Health Insurance Claim Number, the services that were performed for the beneficiary, the date the services were provided, any applicable codes that modify or add additional information about the services (known as "modifiers"), the name and identification number of the health care provider who rendered the services and the name and identification number of the entity that billed for the service provided. Each time a provider or entity submits a claim to Medicare, the provider/entity certifies that the claim is true, correct, complete, and complies with all Medicare laws and regulations. Most claims are submitted electronically.

16.     CMS has the authority to award contracts to private entities to administer the Medicare program.  This program, which is known as a Medicare Advantage Plan or Medicare Part C, follows the same rules and regulations as a traditional Medicare plan.  In some instances, the private entity offers additional coverage, but the most significant difference is that the Medicare Advantage Plan is administered directly by a private entity, not CMS. In exchange for administering Medicare, CMS pays a fixed amount to the private company that offers the Medicare Advantage Plan.

17.     The Medicaid program ("Medicaid") is a federal and state funded health care program providing benefits to low-income persons.  As is the case with Medicare, HHS – through CMS - administers Medicaid in conjunction with the states.  Medicaid is a "health care benefit program" as defined by 18 U.S.C. § 24(b).

18.     The Rhode Island Executive Office of Health and Human Services ("RI EOHHS") operates and administers the Medicaid program, also referred to as "Medical

Assistance," in Rhode Island. Since at least 2019, approximately 90% of the Rhode Island

Medicaid population is enrolled in Medicaid through a Medicaid Managed Care plan.  Like

Medicare Managed Care plans, Medicaid Managed Care plans are administered by several

private entities in Rhode Island, including Neighborhood Health Plan of Rhode Island

("NHPRI"), United Healthcare ("UHC"), and Tufts Health Plan.

19.    The Massachusetts Executive Office of Health and Human Services ("MA

EOHHS") operates and administers the Medicaid program, also referred to as "MassHealth,"

through its Office of Medicaid. Similar to Rhode Island, MassHealth also offers Medicaid

Managed Care Plans that are administered through private entities, including Tufts Health Plan

and BMC HealthNet.

**B.    How Providers Bill Medicare and Other Payors: CPT and HCPCS Codes and Modifiers**

20.    In order to bill health care benefit programs such as Medicare, providers use a

five-digit number, known as a Current Procedural Terminology ("CPT") code, that identifies the

nature and complexity of the service provided.  The CPT codes are listed in the CPT manual,

which is published annually by the American Medical Association ("AMA").  CPT codes are

universally used by health care providers to bill government and private health insurance

programs for services rendered.  Similarly, Healthcare Common Procedure Coding System

("HCPCS") codes are standard codes that represent medical procedures, supplies, products, and

services and are represented by a letter followed by four numeric digits.  Virtually every medical

procedure has its own CPT or HCPCS code and insurance companies pay a specified amount of

money for each CPT code billed.

21.    In some instances, providers render a service that is slightly different from the

CPT or HCPCS code that represents that particular service.  In these instances, providers submit

a claim with a modifier, which is a two-digit code (represented by numbers and/or letters) that indicates a service billed with that CPT or HCPCS code that has been altered in some way, but still fits the definition of that code. For example, a provider can include the modifier "59" with a CPT code for 45 minutes of psychotherapy, which indicates that the service was a distinct service provided in association with another billed service that are not normally billed together.

22.    Typically, providers submit CPT and HCPCS codes and modifiers using a claim form known as a CMS 1500. The CMS 1500 form, completed by the provider or their billing contractor, includes, among other information, the name and provider number of the provider who rendered the service; the name of the patient who received the service; the date the service was performed; a code identifying where the service was provided; the procedure that was rendered (identified by the CPT or HCPCS code); any necessary modifiers; and the diagnosis of the patient's condition for which the service was rendered. Most providers, including RCCA, submit claims to Medicare and other health care benefit programs electronically.

23.    When a provider submits a claim, the provider certifies that the services identified on the form were actually provided by a qualified provider, medically indicated and necessary for the health of the patient. In addition, when a provider becomes a participating provider in Medicare and signs the Participating Provider Agreement, that provider agrees to accept assignment of all Medicare benefits for all covered services for all Medicare beneficiaries.

**C.    RCCA, Brier, and Bruining**

24.    RCCA is operating as an office-based opioid treatment program, or "OBOT," to provide treatment for opioid addiction (which does not include methadone administration). RCCA's primary location is Target Property 1, 381 Wickenden Street, Providence, RI (the "Providence location"). It has additional locations throughout Rhode Island and Massachusetts,

including an office at 7 North Main Street, Suite 200, Attleboro, MA (the "Attleboro location"), at which the laboratory equipment used to perform urine drug testing is housed.  Housed within Target Property 1 is a medical office that was registered with the Rhode Island Secretary of State on February 4, 2018.  As of November 10, 2020, the Rhode Island Secretary of State website lists the fictitious name of this entity as Recovery Connection and lists the purpose of the business as a "medical office."[2]

25.    RCCA has been enrolled in Medicare since April 16, 2018. The company was assigned provider numbers ████████ and ████████ for locations in Massachusetts and Rhode Island, respectively.[3]  RCCA uses its NPI and tax identification number ("TIN") to identify the business as the billing entity when submitting claims for payment.  RCCA's NPI number is ████████ this number has been assigned to RCCA since April 24, 2018 and is associated with RCCA locations in Rhode Island and Massachusetts.  RCCA's TIN is ████████ and, like the NPI, RCCA uses its TIN to identify this business as the billing entity for the providers rendering services at RCCA.

26.    Michael Brier, a former tax preparer, is listed in Rhode Island Secretary of State Records as the current Registered Agent for RCCA.[4]  He is not licensed as a health care provider

---

[2] Rhode Island Secretary of State Business Portal search on 10/3/2022.  The Articles of Incorporation for RCCA, effective February 5, 2018, identify neither Brier nor Dr. #2 as the incorporators; instead, a different person is identified as the incorporator of RCCA and the role of that person in RCCA is unknown.

[3] RCCA has a third provider number, ████████ for a location in Manchester, CT.  This provider number was effective May 31, 2022, and is associated with the same NPI and TIN as the provider numbers/enrollments in Rhode Island and Massachusetts.

[4] Rhode Island Secretary of State Business Portal search on 11/8/2022.

in Rhode Island or Massachusetts. Brier is not a doctor, is not enrolled in Medicare, and does not have an NPI.

27.    On February 11, 2013, Brier pled guilty to tax evasion for underreporting more than $1.1 million in income to the Internal Revenue Service ("IRS") from 2004 to 2009 and to criminal contempt for violating a judge's order that permanently barred him from preparing federal income tax returns for others.  Brier was sentenced to 27 months in federal prison, plus three years of supervised release.

28.    Mi Ok Bruining is an independent clinical social worker and has been licensed by the state of Rhode Island as such since April 26, 2018.  Her license is currently active.[5]  Bruining is enrolled in Medicare and has reassigned her Medicare payments to RCCA since approximately June 2018.  Bruining has been assigned an NPI number since September 26, 2008.

### D.    Barrington Urgent Care, P.C.

29.    On or around July 9, 2018, Medicare received an enrollment application for Barrington Urgent Care, P.C.  Unlike the RCCA Application, this application does not list any managing employees or owners of Barrington Urgent Care, P.C.  However, the contact person for the company is listed as Michael Brier and identifies Target Property 1 as the main address.

30.    The Certification Statement in Section 15 is signed with the name of a person hereinafter referred to as "Dr. #2" and is dated June 28, 2018.  Notably, Dr #2 is identified as the President of Barrington Urgent Care, P.C.  No delegated official is identified in this application for Barrington Urgent Care, P.C.

---

[5] Rhode Island Department of Health license search on 2/20/2023.

31.    On or around July 12, 2018, NGS requests additional information from Barrington Urgent Care, P.C. Notably, this letter is sent to Brier's attention at Target Property 1.  In response to this letter, a supplemental application is submitted for Barrington Urgent Care, P.C., which identified Target Property 1 as the address to which payments should be directed, and lists Dr #2 as the individual with ownership interest in Barrington Urgent Care, P.C. as of April 16, 2018. The Certification Statement in Section 15 is also signed by Dr #2 and dated July 12, 2018.  Brier is also identified as the Delegated Official for Barrington Urgent Care, P.C.  and signs the application as such in Section 16.

32.    Additionally, on or around July 24, 2018, NGS received an Electronic Funds Transfer Agreement for Barrington Urgent Care, P.C.  This agreement identified Target Account 4 as the bank account for Barrington Urgent Care, P.C.

## II.    RCCA MEDICARE APPLICATION AND AGREEMENT

33.    On or about May 3, 2018, Brier caused RCCA to submit to NGS a Medicare Provider Enrollment Application for RCCA, dated April 1, 2018 (the "Application").  The Application identified Dr. #2 as the only Authorized Official for RCCA and the sole owner of the company as of February 5, 2018.  Dr. #2 was listed as the signatory for the Application.  Dr. #2 is listed in the 2019 RCCA Annual Report as the President, Vice President, Treasurer, Secretary and is listed as the signatory on the annual reports filed for RCCA from 2019-2022.

34.    In March 2013, Dr. #2's Medicare enrollment was revoked for one year due to the suspension of Dr #2's license to practice in the state of Ohio.

35.    Section 6 of the Application requires listing of all individuals with an "ownership interest" or who are "managing employees."  Section 6 defines a "managing employee" as:

> a general manager, business manager, administrator, director, or other individual who exercises operational or managerial control over, or who directly or

indirectly conducts, the day-to-day operations of the supplier, either under contract, or through some other arrangement, regardless of whether the individual is a W-2 employee of the supplier.

36.     In Section 6A, the Application falsely listed only Dr. #2.  It failed to list Brier as either an owner or managing employee.  Section 6B requires that each person listed in 6A state whether the person had ever had any of the final adverse legal actions listed in Section 3, which includes convictions within the last ten years of any federal or state felony offense, including, among other crimes, "financial crimes, such as extortion, embezzlement, income tax evasion, insurance fraud and other similar crimes for which the individual was convicted."[6]  Thus, had Brier been correctly listed as an owner and managing employee in Section 6A, he would have had to respond specifically to this question in the affirmative.

37.     The Application also incorrectly checked "No" in Section 3 of this Medicare enrollment application for RCCA, "Final Adverse Legal Actions/Convictions," which requires disclosure of all final adverse legal actions for owners, providers and suppliers for entities seeking enrollment in Medicare.

38.     Brier signed the Application as the Delegated Official for RCCA and thereby certified that he had read the "the contents of this Application" including the Certification Statement in Section 15 and agreed to adhere to all the stated requirements."[7]

39.     Section 15 of the Application outlines the requirement of all Medicare providers to have read Section 14, "Penalties for Falsifying Information" within the application, which

---

[6] Medicare Enrollment Application for Clinics/Group Practices, CMS-855B, Section 3.

[7] Medicare Enrollment Application for Clinics/Group Practices, CMS-855B, Section 15-16. In the Application, Medicare defines a Delegated Official as someone whose signature has the "same force and effect as that of an authorized official, and shall legally and financially bind the supplier to the laws, regulations, and program instructions of the Medicare program."

explains the penalties for deliberately falsifying information in the application to obtain and/or maintain enrollment in Medicare, including 18 U.S.C. § 1347; to "abide by the Medicare laws, regulations and program instructions that apply to this supplier;" and to "not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare," nor to "submit claims with deliberate ignorance or reckless disregard for their truth or falsity."[8]

40.     In interviews with persons who have worked at RCCA since 2018, as further described below, Brier was described as the primary or sole owner and operator of RCCA and the director and manager of all of its operations. Brier is also listed in the RCCA manual dated August 2019 as its director.  It was reported that Dr. #2 serves as practicing doctor at one facility approximately two days a week and Dr. #2 is not listed with any management role in the RCCA manual.

41.     In addition, other records show that Brier operates RCCA, including managing the financial accounts.  For example, the RCCA checking account at Bank of America, ending in -0760, to which Medicare payments for services billed are deposited, identifies Dr. #2 as the account owner.  However, in an April 30, 2018 Business Signature Card completed by Brier, Brier identified himself as the "manager" on the form.  Brier is the only signatory on this form and the only name listed as receiving a debit card for the account ending -0760.

42.     Thus, RCCA misrepresented to Medicare that no owner, provider, or supplier had been convicted of income tax evasion in the ten years prior to the submission of the application. Had Brier been truthfully identified on the Medicare enrollment application as an owner and managing employee of RCCA and disclosed his criminal conviction as required, NGS could

---

[8] Medicare Enrollment Application for Clinics/Group Practices, CMS-855B, Section 15.

have denied this application based on his criminal conviction being within ten years of its submission.[9]

43.    In the original Application to Medicare, Section 3 also requires providers, suppliers, or owners of RCCA to report "Any revocation or suspension of a license to provide health care by any State licensing authority" and "Any Medicare revocation of any Medicare billing number."  As noted above, in March 2013, Dr. #2's Medicare enrollment was revoked for one year due to the suspension of his license to practice in the state of Ohio.  However, the Application, which reflects that it was signed by both Dr. #2 and Brier, falsely checked "No" in this section.[10] Thus, RCCA additionally misrepresented to Medicare that Dr. #2 had not had any adverse actions within the previous ten years.

44.    This Application lists a signature for Dr. #2 in Section 15 as the first Authorized Official Signature.  It is dated April 1, 2018.

45.    Since April 2018, RCCA has received more than $2.4 million in payments for claims to submitted to Medicare, more than $7.2 million in payments for claims submitted to MassHealth and over $6 million for claims submitted to other health care payors.

---

[9] 42 C.F.R. § 424.535(A)(3) describes the various reasons for which CMS can revoke enrollment in the Medicare program, to include a conviction within the previous ten years of a federal or state felony offense, such as income tax evasion. This section specifically includes guilty pleas to these offenses.

[10] In his separate individual revalidation application to Medicare dated March 10, 2020, Dr. #2 did report this revocation under "Final Adverse Legal Actions."

### III.    BILLING FOR 45 MINUTE PSYCHOTHERAPY SESSIONS

#### A.    CPT Code 90834:  Psychotherapy for 45 minutes.

46.    The AMA defines Code 90834 as the provision of psychotherapy for 45 minutes with a patient.  Moreover, Article #A52825, Billing and Coding" Psychiatry and Psychology Services, originally published by NGS on November 28, 2019, provides specific coding guidelines for all psychiatric diagnostic procedures, including code 90834.[11]  This Article states, in part, "Procedure codes 90832-90838 (psychotherapy for 30-60 minutes) – report the code closest to the actual time (i.e., 16-37 minutes for 90832 and 90833, 38-52 minutes for 90834 and 90836, and 53 or more minutes for 90837 and 90838)."  Thus, RCCA could appropriately use code 90834 only for visits lasting between 38-52 minutes.

47.    CPT codes 90832 and 90833 are available for providers who see patients for less than 45 minutes.  Between January 2018 and January 2023, neither of these codes were ever billed by RCCA for psychotherapy services.

48.    NGS guidance also notifies providers of additional requirements for the provision of any psychotherapy services, including that the duration of a course of psychotherapy must be individualized for each patient, and that the medical record should document the patient's symptoms, goals of therapy and methods to monitor the patient's outcome.  Finally, the guidance

---

[11] CMS provides updates and/or clarification to its guidance to providers on the provision and billing for all covered codes through its National Coverage Determinations. Individual Medicare contractors are also permitted to issue Local Coverage Determinations and Articles to provide additional information and clarification to the states within its coverage area.  NGS issued Article #A52825, Billing and Coding" Psychiatry and Psychology Services, for the contracts in its jurisdiction, which includes Rhode Island.  This article has not been rescinded and is still in effect.

requires that providers document the time spent in the encounter and include an updated treatment plan in the medical record.

### B.     Billing by RCCA

49.     I have reviewed the billings submitted by RCCA to Medicare and various private payors for the period of January 1, 2018, through February 7, 2023.  RCCA billed CPT code 90834, which is psychotherapy for 45 minutes with the patient, more than 51,000 times since January 2018.[12]  As shown in the chart below, almost all therapy sessions billed are billed using CPT code 90834, indicating an average of 45 minutes and no less than 38 minutes of therapy rendered to the individual patients.

| All Payors Billed by Recovery Connection 1/1/2018 to 2/3/2023 | | |
|---|---|---|
| **CPT Code** | **Count of Quantity Allowed** | **Sum of Amount Paid** |
| 90834 (45 min) | 51,024 | $3,420,972.05 |
| 90836 (45 min w/ E&M code)[13] | 1 | $113.05 |
| 90837 (60 min) | 180 | $16,141.23 |
| **Grand Total** | **51,205** | **$3,437,226.33** |

---

[12] RCCA has also billed CPT code 90837, which is for the provision of psychotherapy for 60 minutes with a patient.  This code was billed 180 times by RCCA between January 2018 and February 2023.

[13] CPT code 90836 is for 45 minutes of counseling in conjunction with an Evaluation and Management ("E&M") code.  This code would be billed when counseling is provided during the same visit as medical management of non-psychotherapy related issues.

17

50.     The hours of operation for the doctors at RCCA for the Providence location are listed on its website as:

    a.  Monday: 9am-7pm
    b.  Tuesday: 12pm-5pm
    c.  Wednesday: 10am-7pm
    d.  Thursday: 11am-7pm
    e.  Friday: 12pm-5pm
    f.  Saturday: 9am-2pm
    g.  Sunday: Closed

51.     Although the "office hours" for the Providence location, also listed on the RCCA website, are different than the doctor's hours described above, interviews with former employees of RCCA reveal that patients ordinarily do not come to RCCA outside of the hours scheduled for doctors to be present.  In other words, patient appointments are scheduled for the office visit and counseling in the same appointment.  If the doctor is not present in the office, then counselors are ordinarily likewise not in the office.  In addition, former employees have also confirmed that, until fairly recently, there is usually only one counselor working during the hours in which patients are being seen at any location of RCCA; as such, all psychotherapy billed on a particular date of service from a specific RCCA location was provided by a single counselor.[14]

52.     RCCA consistently bills for far more patients seen in the Providence location during office hours than is possible. For example, on Thursdays, the maximum number of patients that could be seen for 45 minutes of counseling between 11am and 7pm is 11.  However, for

---

[14] Under certain conditions, CMS does permit counseling and mental health services to be rendered by providers under the supervision of another licensed provider and billed by the licensed provider, a practice commonly known as "incident to" billing, as long as the rendering provider meets state criteria for rendering such services.  Thus, it is permissible for counselors to perform counseling under Bruining's state license and for the services to be billed under her billing number as long as those counselors otherwise meet their state's requirements for performing mental health services and other relevant requirements are met.  LCD #33632, Psychiatry and Psychology Services (which sets forth the medical necessity requirements for the diagnosis and treatment in the field of psychology).

example, on Thursday June 25, 2020, RCCA billed for 38 different patients, all for 45 minutes of counseling, totaling 1,710 minutes, or 28.5 hours in one day, which is impossible.

53.    Recently, current and former RCCA employees have reported that some days the Providence location has two counselors working the same shift.  However, medical providers covering the Providence location have told agents that even with two counselors, not all patients are able to be seen for counseling, and that those who are seen for counseling are still not seen for more than 15 minutes based on how the appointments are booked.

## C.    Statements of Current and Former Employees Re: Length of Psychotherapy Sessions

54.    During the course of this investigation, agents, including this affiant, have interviewed numerous current and former employees of RCCA.  Many of the current and former RCCA employees who were interviewed discussed several issues of which they became aware. The first issue involved billing for 45 minutes of counseling when most patients in the Providence, Attleboro, and Taunton locations were not seen for anywhere near that long.   As further described below, numerous employees reported that they were aware that although Bruining instructed counselors to see all patients who were scheduled for that day, Bruining also instructed the counselors to only see the patients for 5-10 minutes, at most, because there were so many patients being seen at these locations.

### Mi Ok Bruining

55.    On or about February 3, 2023, in an interview with law enforcement, Bruining reported the following, in substance, among other things:

    a.    Upon being licensed as a counselor, Bruining began supervising other counselors at RCCA. As part of her supervisor responsibilities, Bruining trained the counselors after they were hired, including telling the counselors to see patients "as soon as you can, as quickly as you can."  She also told counselors, "It's not the time spent, it's that you see everyone."

b.  Bruining described her own method of counseling as checking with the patient to see if they relapsed.  If the patient was good, then the counseling appointment would be short, which Bruining referred to as a "drive by."  Initially, Bruining told agents that she would document this type of encounter as 15 minutes with the patient.

c.  Bruining told agents that she knew that counseling could be billed for 15-/30-/45-minute sessions.

d.  At first, Bruining told agents that she did not tell other counselors to document that they had spent 45 minutes with patients.

e.  After further questioning, Bruining admitted that RCCA had been billing counseling sessions for 45 minutes when in fact they lasted only a few minutes to 15 minutes and that she knew it was wrong.  She also made clear that this practice was undertaken at the direction of Brier and that Brier was fully aware of it and that it was wrong.

f.  Bruining told agents that Brier told her to see as many clients as possible and that Brier was the person who instructed her [Bruining] to tell the other counselors to document that 45 minutes had been spent with every patient. It was Bruining's understanding that Brier gave her this instruction so that he could bill for 45 minutes because it is reimbursed by insurance for more money.

g.  Brier told Bruining, "When you hire a counselor tell them they can document client counseling sessions for 45 minutes regardless of time spent."  Bruining told agents that she said "okay" after Brier gave her this instruction.

h.  Bruining told agents that she knew that what she was doing was not right but when she pushed back on Brier, he would say, "Do you want your job?  If you don't like it, you can go."  Bruining also told Brier that she had a problem with documenting 45 minutes of counseling for every patient, but Brier did not care and told Bruining, "Don't worry about it, you're not doing the billing."

i.  Bruining was aware that RCCA was the subject of audits by insurance companies, including UHC's behavioral health manager, Optum.  As part of this audit, Optum requested counseling notes for various patients.  Prior to giving the requested records to Optum, Brier directed Bruining to change the patient counseling note to reflect that the patient was seen for 45 minutes so that the medical record matched what was billed to UHC, despite the fact that no patients at RCCA were seen for 45 minutes.

j.  In order to comply with Brier's direction, Bruining maintained a copy of her counseling notes that were separate from those in Practice Fusion, an electronic health record system used by RCCA, and added the end time to each note that was being provided to Optum.  In other words, if a patient's record already had a start time of 9am, Bruining edited the record to reflect that the patient was seen by a

counselor from 9:00-9:45am. These edited records were then printed by Bruining and sent to Optum. Bruining then deleted her copy of the edited records.

### Current Medical Practitioner and Manger #1

56. On or about February 14, 2023, Manager #1 reported in substance the following,

among other things:

a. Manager #1 is licensed as a Nurse Practitioner ("NP") in the state of Rhode Island and has worked for RCCA since April 2019.  He/She began as a part-time employee and was promoted to co-Medical Director and worked full-time as of August 2021.

b. When Manager #1 began working for RCCA full-time in August, he/she worked to change the patient scheduling to allow for 15 minutes for follow-up patients and 30 minutes for new patients for both medical appointments and counseling appointments.  Prior to this change, as many as four patients were being scheduled in the same 15-minute time slot.  Prior to Manager #1 implementing these changes, RCCA counselors were only able to see patients for "minutes." Manager #1 estimated that previously, patients spent a <u>total</u> of 10-15 minutes at RCCA for their medical visit, counseling visit, and providing a urine sample.

c. Manager #1 fought a lot with Brier about the scheduling change, but Brier would not budge. Brier took a "big hit" financially when the patient times were changed to allow for even 15 minutes per patient because fewer patients were seen per day.

d. Manager #1 was not part of the billing process and was not aware how the counseling sessions are being billed.[15]

e. He/She became aware only very recently that RCCA has been billing for 45 minutes of counseling for these patients.

f. Even since making the scheduling changes, patients are still only seen for 15 minutes, not 45 minutes, of counseling.

g. Providers are still sometimes overbooked, despite the scheduling changes implemented by Manager #1.  He/She estimated that approximately 30% of scheduled patients are "no shows."

h. In the summer of 2022, RCCA was the subject of an audit by Harvard Pilgrim ("HP").  It was during this audit that Manager #1 became aware that the counseling notes were "terrible" because every note was the same and yet said

---

[15] In fact, Medicare billing records reflect that RCCA counseling sessions are continuing to be billed routinely as 45-minute sessions, through at least February 2, 2023.

nothing about the encounter with the patient. The counseling notes were for dates of service during which Bruining was the supervisor for the counselors.

i.  Manager #1 also became aware during the HP audit that Urine Drug Screen ("UDS") tests being billed by RCCA were always at the highest level, despite providers only needing confirmation testing for far fewer drugs than the number of tests for which RCCA was billing. When Manager #1 and CE #7 told Brier that the providers had to start coding themselves for the appropriate level of the UDS test that the patient needed, Brier's response was that "providers are monkeys who can't code."

j.  Manager #1 told agents that RCCA's biller, Former Employee #7 ("FE #7"), has recently resigned.[16] When Manager #1 would ask FE #7 about the billing codes, FE #7 always responded by saying, "I have to ask Michael." FE #7 reported directly to Brier.

57.  On February 15, 2023, agents interviewed Former Employee ("FE") #7, who

reported in substance the following, among other things:

a.  FE #7 began working as the medical billing manager for RCCA on June 19, 2020, and reported directly to Brier throughout his/her employment, which ended approximately two weeks prior to speaking with the agents. FE #7 was responsible for submitting initial claims for RCCA and re-submitting denied claims.

b.  FE #7 reported directly to Brier.

c.  When FE #7 was hired by RCCA, FE #7 was told what to bill by Brier, who would send FE #7 the patient schedule for the medical providers and the separate schedule for the counselors for the previous day via email. FE #7 later downloaded the patient schedule from the electronic health record system used by RCCA after Practice Fusion, which is AdvancedMD.

d.  FE #7 was instructed by Brier to use these patient schedules and bill the CPT codes based on his instructions, which were available in a drop-down menu in the on-line claims submission software used by RCCA. Brier instructed FE #7 to bill CPT code 90834 (for 45 minutes of counseling) for all counseling appointments, unless the provider was with the current Director of Behavioral Health, in which case FE #7 was instructed to bill CPT code 90837 (for 60 minutes of counseling). FE #7 billed solely based on these instructions from Brier; counseling was not

---

[16] On January 31, 2023, two search warrants were granted by U.S. Magistrate Judge Lincoln Almond for email accounts held by Google, Inc. and IONOS, Inc. The affidavits supporting these warrants referenced Current Employee # 4 (CE #4). Since those search warrants were granted, CE #4 has resigned from RCCA and is now identified in this affidavit as FE #7.

billed based on the service that was actually provided to the patient. In fact, counseling was billed universally under CPT code 90834 unless the Director of Behavioral Health was identified as the provider. FE #7 was aware that the codes billed by RCCA should have been more varied and based on the service actually provided to the patient.

e. These instructions from Brier were given to FE #7 when he/she was first hired and did not change throughout the course of his/her employment.

f. If a patient missed an appointment or was a "no-show," FE #7 would have no way of knowing this because he/she was instructed to bill based on the schedule only.

**Former Employee #1**

58.    FE #1 reported in substance the following, among other things:

a. He/She was hired as a counselor for RCCA and worked there from approximately November 2018 through September 2019. FE #1 covered the Providence and Attleboro locations of RCCA. FE #1 was trained by and reported to Bruining.

b. FE #1 worked primarily in the Providence location and shared an office with Bruining. FE #1 later worked in the Attleboro office. During FE #1's training, he/she observed Bruining bring patients into the counselor's office, ask patients if they had used illicit drugs, then telling the patients they could leave once that question was answered, regardless of the answer. These patients were billed for 45 minutes of counseling.

c. Bruining specifically instructed FE #1 to see patients for only 5-10 minutes. In addition, FE #1 was aware that Brier could watch the office from a remote location through the various cameras that were set up in the Providence office. Brier would call FE #1 and tell him/her to "get things moving" after watching the cameras and seeing how often patients were being seen for counseling by FE #1. Brier also told FE #1 that patients were not in the office to have a long conversation with FE #1. FE #1's direction from both Bruining and Brier was to spend "5-10 minutes tops" with patients.

d. Other RCCA employees would interrupt the counseling sessions if FE #1 took too long with a patient. For example, Former Employee (FE) #8 would frequently knock on the door and tell FE #1 to see the next patient because he/she was taking too long.[17] On other occasions, Brier would call another RCCA employee and instruct him/her to tell FE #1 to see patients faster.

---

[17] Similar to Current Employee #4, the affidavits supporting the warrants to Google, Inc, and IONOS, Inc. referenced Current Employee #1 (CE #1). Since then, agents learned that CE #1 was terminated from RCCA and will now be identified in this affidavit as FE #8.

    e. During the course of FE #1's employment at RCCA, Bruining would become angry at FE #1 when he/she met with patients for closer to 30-45 minutes. If FE #1 did meet with patients for this long, Brier would call the clinic to tell other employees to tell FE #1 to "move faster."

    f. During FE #1's first two weeks at RCCA, during which he/she was trained by Bruining, FE #1 was instructed by Bruining on how to use the electronic medical record system, Practice Fusion, and enter the time spent with the patient as 45 minutes. FE #1 documented that he/she spent 45 minutes with all patients in his/her counseling note, which was used to bill public and private insurers, including Medicare. Bruining instructed FE #1 to copy and paste the last visit's note in order to make the note look complete. When FE #1 told Bruining that he/she cannot say he/she saw patients for 45 minutes if they are not really being seen for that long, Bruining told FE #1 that "[he/she] could not change it."

    g. It was FE #1's standard practice to handwrite the names of all the patients seen by him/her while working at RCCA. These patients had times next to their names in 45-minute blocks, which indicated the time that should be entered into Practice Fusion. Notably, none of these times had AM or PM listed next to it. FE #1 told agents that the times did not reflect the amount of time actually spent with the patient; instead, it was meant to ensure there was no overlap in times for specific dates of service when being entered into the medical record.

59.    I have reviewed the documents provided by FE #1, RCCA records in Practice Fusion that were entered by FE #1 under Bruining's name and RCCA billing records, and observed the following:

    a. The section in the record that would document counseling is, for the vast majority of patients seen by FE #1, cut and pasted from previous notes. In addition, there are many dates that contain entries, however minimal, by FE #1 that correspond with dates of service on which so many 45-minute codes were billed that it resulted in impossible days.

    b. For example, on July 24, 2019, FE #1 entered notes into Practice Fusion for 39 different patients. All of the notes read "Objective: Client will actively participate in relapse prevention, NA/AA meetings, finding a sponsor and a home group, as well as learn how to communicate effectively with family members and relatives, in addition to learning about stress reduction, productive activities, taking responsibilities and being accountable for all actions and actively working one's recovery."

    c. The handwritten patient list for July 24, 2019, from FE #1 contains the names of 39 different patients who FE #1 saw on that date of service. The first patient has "9:00" next to his/her name; the last patient on the list has "1:30" next to his/her

name. Notably, several times are repeated because the 45-minute blocks of time amount to more than a 24-hour day if taken consecutively.

d.   The claims submitted by RCCA for July 24, 2019, reflect that 35 of the 39 patients on FE #1's handwritten list were billed for 45-minutes of counseling by RCCA, all of which were identified as being rendered by Bruining.[18] In total, 1,530 minutes of counseling was billed for patients seen by FE #1 on that day, which is equivalent to 25.5 hours, which is impossible.  RCCA was paid $2,002.20 for these claims.

**Former Employee #2**

60.    FE #2 reported in substance the following, among other things:

a.   FE #2 was a counselor at RCCA from approximately December 2020 until April 4, 2022.  FE #2 covered the Taunton, MA location of RCCA (the "Taunton location") but was trained by Bruining in the Providence location and reported to Bruining.  FE #2 understood that Brier was the owner of RCCA.

b.   His/her initial training at RCCA involved shadowing Bruining in the Providence office for two weeks, after which FE #2 provided counseling at RCCA's Taunton location.  FE #2 also filled in as needed at the Attleboro location.  The training FE #2 received from Bruining consisted of FE #2 sitting in counseling sessions with Bruining and her patients.  During this training with Bruining, FE #2 observed the counseling sessions lasting only 5-10 minutes.  Bruining saw about 40 patients a day at the Providence location.  Bruining would brag about seeing so many patients in one day and about how productive she was.

c.   When he/she began seeing patients in the Taunton office, FE #2 was encouraged by Bruining to follow her practice, i.e., only see patients for 5-10 minutes.  FE #2 was also encouraged by the providers at the Providence office to only see patients for counseling for 5-10 minutes, including Dr. #2, who told FE #2 that it was good that FE #2 had only seen patients for 5-10 minutes because that was "how we wanted it done here [Providence]."  FE #2 was also pressured by Current Employee (CE) #2 to see patients for 5-10 minutes.  In fact, CE #2 and FE #2 created a list of perfunctory questions to ask patients so the sessions would go quickly.

d.   Once he/she began working in the Taunton location, he/she continued the practice of seeing patients for only 5-10 minutes of counseling, despite knowing that it was wrong, but questioned "what was I going to say?" There were times when

---

[18] It is unknown at this point in the investigation why 4 patients were not billed for this date of service, despite being on FE #1's list.

he/she only saw patients for two minutes and no patient was ever seen for even 30 minutes.  He/She saw about 30 patients in a typical 4-hour shift at RCCA.

e.  RCCA had a mandatory policy for all patients to receive counseling services.  FE #2 was encouraged by CE #2 to bring patients back into the office if they tried to leave before receiving counseling.  It is FE #2's belief that RCCA had this mandatory policy in place because "it was all about the notes."

f.  FE #2 was not licensed as a social worker and worked under Bruining's license. Bruining was the "gatekeeper" of the counseling notes in Practice Fusion.

### Former Employee #3

61.  FE #3 reported in substance the following, among other things:

a.  FE #3 worked as a counselor for RCCA from approximately January to March 2020.  FE #3 understood that Brier is the owner of RCCA and received his/her paycheck from Brier.

b.  FE #3 was trained by Bruining in the Providence office when FE #3 was initially hired.  During this training, FE #3 observed that counseling sessions held by Bruining lasted 3-5 minutes.

c.  FE #3 was also trained by Bruining on using Practice Fusion and how to write his/her counseling notes.  Bruining provided FE #3 with a template to use when writing notes and would return notes to FE #3 for correction if they did not conform to the template.

d.  FE #3 was instructed by Bruining to not enter "AM" or "PM" after the time in the counseling notes, and that FE #3 only needed to write times in the notes that amounted to 45 minutes, despite only spending a few minutes with each patient.

e.  If FE #3 spent more than 10 minutes with a patient, Bruining told FE #3 that there were too many patients for FE #3 to spend a lot of time with a single patient.  FE #3 was specifically told to get through as many patients as he/she could each day. In one instance, Bruining told FE #3 that he/she could not spend the time to find housing for patients who were homeless.  FE #3 recalled receiving an email from Bruining in which Bruining told FE #3 that he/she was spending too much time with RCCA patients.  FE #3 estimated that he/she saw between 40 and 60 patients per day while working at RCCA.

f.  Brier liked Bruining because she was making a lot of money for Brier.

### Former Employee #4

62.  FE #4 reported in substance the following, among other things:

a. FE #4 worked as a counselor for RCCA for approximately six to nine months in 2019, leaving around January 2020. FE #4 covered the Providence and Attleboro locations for RCCA.

b. FE #4 worked in the Providence and Attleboro locations for RCCA and was trained by Bruining for one day upon being hired. During that first day, FE #4 observed Bruining see approximately 28 patients during the 3–4-hour shift. FE #4 observed Bruining spending only a few minutes with each patient; some patients did not even sit down because the counseling session was so brief. During another shift, FE #4 observed Bruining seeing 48 patients and noted that if all 48 patients were billed for 45 minutes of counseling, it would cover two full days.

c. The daily schedule was printed for FE #4, but FE #4 was told that it was just a way to track patients coming in that day, not what times they were seen. However, FE #4 was directed by Bruining to write down the start time of the counseling session to match the scheduled time and to write counseling notes in 45-minute blocks of time "so Bruining could match up the notes." FE #4 was also directed by Bruining to not write the end time of the counseling sessions and to not document "AM" or "PM" in the notes. Bruining told FE #4 that neither the schedule nor FE #4's notes were related to billing. Bruining further told FE #4 that "it was complicated" and "don't worry about it."

d. FE #4 was told by FE #7, that RCCA was billing insurances for one hour counseling sessions. FE #4 told agents that he/she panicked after learning this because FE #4's counseling sessions lasted no more than 15 minutes and FE #4 was concerned he/she could lose his/her license for improper billing. FE #4 estimated that he/she saw 4-5 patients per hour in the Attleboro location.

e. FE #4 emailed Bruining to ask about the billing and told agents he/she also copied the owner of RCCA, whom he/she identified as Brier, on the email. As will be discussed in more detail later in this affidavit, FE #4 recalled that Bruining was dismissive in her response and that Brier was hostile and tried to stop FE #4 from asking about billing at all. FE #4 recalled that he/she was told that RCCA was billing for 45-minute counseling sessions because they had negotiated a special rate with the insurance companies for the counseling sessions. FE #4's understanding was the "deal" was between Brier and United Healthcare and Neighborhood Health Plan of Rhode Island.[19]

f. FE #4 was pushed by Bruining, Brier, and FE #8 to see patients faster. The expectation was that FE #4 would see at least 20 patients in one 4-hour shift; in fact, if FE #4 saw 28 patients in one shift, he/she was congratulated. If FE #8 felt

---

[19] The provider agreement between Neighborhood Health Plan of RI ("NHPRI") and RCCA was reviewed by this affiant. This agreement does not document a negotiated flat rate for code 90834. In fact, the agreement specifically states that RCCA agrees to accept the standard fee schedule reimbursement rate published by NHPRI.

FE #4 was taking too long during counseling sessions, he/she would bang on the door, sometimes as quickly as five minutes into a session.

g.  FE #4 told agents that for every shift he/she worked, there was always a patient who he/she would have spent more time with had Bruining, Brier, and FE #8 not pushed to get patients in and out quickly.

h.  FE #4 worked under Bruining's license, despite the fact that Bruining was rarely in the Providence office once FE #4 started working.  FE #4 left RCCA because he/she was nervous about how RCCA was billing insurance companies.

i.  Prior to leaving RCCA, FE #4 took pictures of the "Recovery Connection Clinician Manual," which is dated August 2019 and identifies Bruining as the Senior Clinician and author of the manual.  These photos were provided to the agents and the following information is contained in the manual:

    i.   Page 3 lists Brier as the Director of RCCA.
    ii.  Page 4 lists Bruining as the RCCA Supervisor/Senior Clinician.
    iii. Page 16 describes how to document counseling in the patient's SOAP (Subjective, Objective, Assessment and Plan) note.  The first line on this page reads, "NAME: (First and last name) DATE: (8/23/19) TIME: (9:00 – do not indicate AM or PM and always 45 minutes)."
    iv.  In addition, the next sections on page 16 describe what should be documented under "Subjective" and "Objective" in a patient's note.  Under "Objective," the section reads: "Client will actively participate in relapse prevention, NA/AA meetings, finding a sponsor and a home group, as well as learn how to communicate effectively with family members and relatives, in addition to learning about stress reduction, productive activities, taking responsibilities [sic] and being accountable for all actions and actively working one's recovery. (This doesn't change)."  Both sections end with "(This doesn't change)."  In other words, the clinician was expected to cut and paste these sections in every note written for every patient without regard to individualization.

### Former Employee #5

63.  FE #5 reported in substance the following among other things:

a.  FE #5 was the office manager for the RCCA Providence location from about February 2020 until February 2021 and reported to the owner, Brier.

b.  During FE #5's employment at RCCA, he/she observed patients spending no more than 3-5 minutes with the counselor yet was aware that these same patients' insurance was billed for 45-minute counseling sessions.  FE #5 knew that patient's insurances were billed for 45-minute counseling sessions because

patients would often show their statement of benefits to FE #5 and ask why 45 minutes of counseling had been billed.

c.  When FE #5 asked the biller at RCCA, FE #7, why patients had been billed for 45 minutes of counseling when they had only seen Bruining for a few minutes, FE #7 told FE #5 that he/she had to bill for 45-minute sessions in order to get paid.

d.  When FE #5 told Brier that patients did not want to see the counselor, Brier made it mandatory for patients to see the counselor, but patients continued to see counselors for 2-3 minutes at most while RCCA billed for 45-minute counseling sessions. If patients refused to see the counselor, then they could not receive their suboxone prescription.

e.  Dr. #2 worked in the Providence office on Thursdays and asked for patients to be scheduled for every ten minutes, which resulted in up to 75 patients for one day.

f.  Bruining told FE # 5 that she fills in her patient notes before the patient even comes in for counseling.  FE #5 also observed FE #8 knocking on the counselor's door during sessions with patients in order to get the next patient in for counseling.

### Former Employee #6

64.    FE#6 reported in substance the following, among other things:

a.  FE #6 worked as the office manager for the RCCA Taunton office from June 2020 to June 2021.  FE #6 understood that Brier was the owner of RCCA.

b.  All the counselors had a problem with Bruining, partly because Bruining instructed the counselors to write notes as though they saw patients for 45 minutes, despite the fact that most patients only spent 15 minutes at most, on average, with the counselor in Taunton.  If patients were not seen by the counselor, then Bruining would be upset.

c.  FE #6 had a bell that he/she would ring in the Taunton office if it looked like patients were getting backed up. FE #6 would also get calls from Bruining, asking why patients were not being seen by counselors.  In response, FE #6 would tell Bruining that there was not enough time for patients to be seen.

d.  FE #6 would sometimes cover for FE #5 as the office manager in Providence.  FE #6 described Bruining as the "5-minute queen" because that was how long she spent counseling patients in that office.  FE #6 estimated that 30 patients were seen during a weekday shift in Providence, while on Saturdays, when the office was open from 9am-5pm, approximately 60 patients came in.

e.  FE #6 was trained to assist FE #7 with billing for RCCA.  FE #6 was instructed by FE #7 to bill the patient's medical appointment on one date of service and the counseling session on the following date of service, even though the patient only

came in on one of those days.  FE #7 told FE #6 that Brier had directed him/her to bill in this way.  When FE #6 had any questions about the billing, FE #7 always responded with something to the effect of "This is how Michael [Brier] wants us to do it."

**D.    Statements Of Patients Concerning Psychotherapy Sessions Length**

65.    Agents interviewed multiple patients who receive treatment at RCCA and for whom RCCA bills Medicare for 45-minute psychotherapy sessions.  Several patients reported that they never received 45-minute sessions and the sessions they did have were usually shorter than 15-20 minutes, including as little as five minutes, as further described below.

**Patient A**

66.    On March 16, 2021, agents interviewed Patient A, who goes to the Providence office of RCCA once a month.  Patient A reported in substance the following, among other things:

    a.    Patient A sees Dr. #2 for his/her medical visit and meets with a woman, described as an Asian female, for counseling.  Patient A meets with the counselor for approximately 10-15 minutes.

    b.    When asked if he/she has ever spent 30 minutes or more with the counselor at RCCA, Patient A stated, "No."

67.    Billing records submitted by RCCA for dates of service between February 14, 2019, through February 2, 2023, show that RCCA billed Medicare 38 times for code 90834 for 45-minute counseling sessions with Patient A, which requires a minimum of 38 minutes and average of 45 minutes, despite Patient A never having received counseling for this long. Bruining is identified as the rendering provider for all the psychotherapy claims, except for the most recent two claims billed in 2023, which identifies the current Director of Behavioral Health as the rendering provider.  Medicare paid RCCA $2,271.78 for these claims.

68. The following chart provides an example of seven claims to Medicare for counseling services for Patient A:

| Date | Code | Code Description | Amt. Paid | Rendering Provider NPICS Name | Billing Provider NPICS Name | Plan |
|------|------|------------------|-----------|-------------------------------|-----------------------------|------|
| 2/14/2019 | 90834 | Psychotherapy, 45 minutes | $55.24 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 3/11/2021 | 90834 | Psychotherapy, 45 minutes | $63.55 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 6/23/2022 | 90834 | Psychotherapy, 45 minutes | $62.62 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 7/21/2022 | 90834 | Psychotherapy, 45 minutes | $61.98 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 8/18/2022 | 90834 | Psychotherapy, 45 minutes | $61.98 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 9/15/2022 | 90834 | Psychotherapy, 45 minutes | $61.98 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 10/13/2022 | 90834 | Psychotherapy, 45 minutes | $61.98 | Bruining, Mi Ok | Recovery Connection | Medicare |

69. The other 31 claims billed by RCCA to Medicare for Patient A are nearly identical to the examples provided above.

**Patient B**

70. On March 16, 2021, agents interviewed Patient B, who goes to the Providence RCCA once a month. Patient B reported in substance the following, among other things:

   a. In the previous six months, he/she has spent 10-15 minutes with the counselor, Mi Ok Bruining. Some counseling sessions with Bruining were as short as five minutes. Patient B also saw another counselor at RCCA, other than Bruining, and only saw this counselor for 10-15 minutes.

   b. During the counseling sessions, Patient B did not feel either of the counselors asked him/her questions that made Patient B feel like they knew anything about him/her. During the counseling sessions, other RCCA employees would interrupt the session, including FE #8 and FE #5, to ask the counselor questions.

   c. Patient B understood that RCCA is owned by a man named Michael, but he/she did not recall his last name.

71. Billing records submitted by RCCA for dates of service between July 10, 2019, and January 6, 2023, show that RCCA billed Medicare 8 times for code 90834 for counseling for

Patient B, despite never providing that much counseling.  Bruining is identified as the rendering

provider for all the counseling claims except for the most recently submitted claim. [20]  Medicare

paid RCCA $452.71 for these claims. The following chart shows the claims to Medicare for

Patient B for counseling services:

| Date | Code | Code Description | Amt. Paid | Rendering Provider NPICS Name | Billing Provider NPICS Name | Plan |
|------|------|------------------|-----------|-------------------------------|------------------------------|------|
| 7/10/2019 | 90834 | Psychotherapy, 45 minutes | $55.24 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 8/7/2019 | 90834 | Psychotherapy, 45 minutes | $55.24 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 10/17/2019 | 90834 | Psychotherapy, 45 minutes | $55.24 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 11/14/2019 | 90834 | Psychotherapy, 45 minutes | $55.24 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 2/17/2020 | 90834 | Psychotherapy, 45 minutes | $57.16 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 3/17/2020 | 90834 | Psychotherapy, 45 minutes | $57.16 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 4/14/2020 | 90834 | Psychotherapy, 45 minutes | $57.16 | Bruining, Mi Ok | Recovery Connection | Medicare |

**Patient C**

72.    On September 24, 2021, agents interviewed Patient C, who goes to the Attleboro

RCCA once a month.  Patient C reported in substance the following, among other things:

  a.  He/She does not see the counselor much.  When asked if he/she had 45-minute
      counseling sessions at RCCA, Patient C stated that that was "not true at all."  The
      longest Patient C has met with any counselor at RCCA is 15-20 minutes.

  b.  RCCA is owned by a man named Michael but he/she did not recall his last name.

73.    Between November 23, 2018, and December 5, 2022, RCCA billed Medicare 42

times for 45 minutes of psychotherapy using CPT code 90834 for Patient C, despite never

providing that much counseling. Medicare paid RCCA a total of $2,443.20 for the counseling

---

[20] 7 of the 8 claims for Patient B were billed between July 2019 and April 2020.  The eighth claim was submitted for
a date of service of January 6, 2023 under the current Director of Behavioral Health.

billed for Patient C. The following chart provides an example of ten claims submitted to Medicare by RCCA for counseling services for Patient C:

| Date | Code | Code Description | Amt. Paid | Rendering Provider NPICS Name | Billing Provider NPICS Name | Plan |
|------|------|------------------|-----------|-------------------------------|------------------------------|------|
| 11/23/2018 | 90834 | Psychotherapy, 45 minutes | $53.63 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 6/10/2019 | 90834 | Psychotherapy, 45 minutes | $55.21 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 6/27/2019 | 90834 | Psychotherapy, 45 minutes | $55.21 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 4/2/2020 | 90834 | Psychotherapy, 45 minutes | $57.22 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 6/25/2020 | 90834 | Psychotherapy, 45 minutes | $52.41 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 7/1/2021 | 90834 | Psychotherapy, 45 minutes | $63.70 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 10/19/2021 | 90834 | Psychotherapy, 45 minutes | $63.70 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 8/11/2022 | 90834 | Psychotherapy, 45 minutes | $62.12 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 9/9/2022 | 90834 | Psychotherapy, 45 minutes | $62.12 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 10/7/2022 | 90834 | Psychotherapy, 45 minutes | $62.12 | Bruining, Mi Ok | Recovery Connection | Medicare |

74.    The other 32 claims billed to Medicare for Patient C are nearly identical to the examples in the table above.

75.    The medical records for Patient C in Practice Fusion begin on January 10, 2019; the most recent entry is June 15, 2022.  The "Objective" section of the SOAP note for Patient C is largely identical from January 2019 through at least November 11, 2021, which reads:

Objective:* Client will actively participate in relapse prevention, NA/AA meetings, finding a sponsor and a home group, as well as learn how to communicate effectively with family members and relatives, in addition to learning about stress reduction, productive activities, taking responsibilities and being accountable for all actions and actively working one's recovery.

76.    For example, the note in the medical record for Patient C for a June 25, 2020 visit is identical to the note described above; no individual assessment is noted in the chart for Patient C for this date of service ("DOS") and no updated information was documented.

77.     The Practice Fusion audit file for June 2020 shows that a counselor accessed Patient C's chart in Practice Fusion on June 25, 2020, for approximately two minutes, from 11:05 pm to 11:07 pm., and made several changes and additions to Patient C's record.  In addition, the audit file shows that on June 26, 2020, Bruining also accessed Patient C's chart for a little over a minute and made changes to the chart notes.[21]

78.     On July 13, 2020, Medicare received four claims for Patient C, including one for 45 minutes of psychotherapy, CPT code 90834, (DOS on June 25, 2020), as well as one for an office visit, CPT code 99214 (June 25, 2020 DOS), two urine drug testing codes, CPT codes 80307 and G0483 (DOS June 26 and 27, 2020, respectively).

**Patient D**

79.     On April 20, 2022, agents interviewed Patient D, who reported in substance the following, among other things:

    a.  He/She sees a counselor at the Providence office of RCCA for 5-10 minutes when he/she is in a "bad condition."  When asked how often this happens, Patient D told agents that he/she is "always in a bad condition."  Patient D also told agents that he/she sees a medical provider and a counselor at his/her visits at RCCA.

    b.  He/She never had a therapy session lasting 45 minutes. In fact, Patient D told agents that most visits at RCCA take 30 minutes in total for the provider and counselor visit.

---

[21] Practice Fusion does not provide details on exactly what changes or additions are made in a patient's chart; it only documents that a change or addition was made. However, former employees reported in interviewed that Bruining would routinely review their notes, sometimes make changes, and then sign the chart so that the service could be billed under her provider number.

80.    Between June 16, 2021 and January 12, 2023, RCCA billed BCBSRI for 45 minute psychotherapy sessions for Patient D at least 13 times as follows:

| Date | Code | Code Description | Amt. Paid | Rendering Provider NPICS Name | Billing Provider NPICS Name | Plan |
|------|------|------|------|------|------|------|
| 6/16/2021 | 90834 | Psychotherapy, 45 minutes | $55.64 | Bruining, Mi Ok | Recovery Connection | BCBSRI |
| 7/9/2021 | 90834 | Psychotherapy, 45 minutes | $55.64 | Bruining, Mi Ok | Recovery Connection | BCBSRI |
| 8/6/2021 | 90834 | Psychotherapy, 45 minutes | $55.64 | Bruining, Mi Ok | Recovery Connection | BCBSRI |
| 9/3/2021 | 90834 | Psychotherapy, 45 minutes | $55.64 | Bruining, Mi Ok | Recovery Connection | BCBSRI |
| 10/4/2021 | 90834 | Psychotherapy, 45 minutes | $55.64 | Bruining, Mi Ok | Recovery Connection | BCBSRI |
| 10/28/2021 | 90834 | Psychotherapy, 45 minutes | $55.64 | Bruining, Mi Ok | Recovery Connection | BCBSRI |
| 11/9/2021 | 90834 | Psychotherapy, 45 minutes | $55.64 | Bruining, Mi Ok | Recovery Connection | BCBSRI |
| 12/6/2021 | 90834 | Psychotherapy, 45 minutes | $55.64 | Bruining, Mi Ok | Recovery Connection | BCBSRI |
| 1/17/2022 | 90834 | Psychotherapy, 45 minutes | $59.44 | Bruining, Mi Ok | Recovery Connection | BCBSRI |
| 2/16/2022 | 90834 | Psychotherapy, 45 minutes | $59.44 | Bruining, Mi Ok | Recovery Connection | BCBSRI |
| 3/15/2022 | 90834 | Psychotherapy, 45 minutes | $59.44 | Bruining, Mi Ok | Recovery Connection | BCBSRI |
| 4/11/2022 | 90834 | Psychotherapy, 45 minutes | $59.44 | Bruining, Mi Ok | Recovery Connection | BCBSRI |
| 5/9/2022 | 90834 | Psychotherapy, 45 minutes | $59.44 | Bruining, Mi Ok | Recovery Connection | BCBSRI |

81.    On April 11, 2022, agents surveilled the Providence office and identified several patients seen on that day, one of which was Patient D.  At approximately 3:08pm, Patient D was observed entering RCCA, then was again observed leaving the Providence location at 3:46pm, for a total time in the office of approximately 38 minutes.  Based on Patient D's statements to agents, this visit would have included checking in, providing a urine sample, seeing the medical provider, and seeing the counselor.

82. On April 20, 2022, BCBSRI received four claims for Patient D. Three of these claims were billed as one office visit, CPT code 99213, billed for DOS April 11, 2022, and two urine drug testing codes, CPT codes 80307 and G0483, billed for DOS April 12 and April 14, 2022, respectively. The fourth code, billed as having been rendered on April 11, 2022, was for 45 minutes of psychotherapy with CPT code 90834.

### Patient E

83. On April 20, 2022, agents interviewed Patient E, who goes to the Providence RCCA for treatment. Patient E reported in substance the following, among other things:

    a. He/She sees the RCCA counselor for 10-15 minutes during the appointments.

    b. During the most recent visit at RCCA on April 8, 2022, he/she saw the counselor for 10 minutes.

84. The claims submitted by RCCA for Patient E show that between June 12, 2019, and January 27, 2023, RCCA billed code 90834 for 45-minute counseling visits 20 times. Although no counseling was billed on April 8, 2022, there is a claim for code 98934 on April 7, 2022, for a 45-minute visit.

85. The following table shows claims billed to and paid by NHPRI and UHC by RCCA for counseling services for Patient E:

| Date | Code | Code Description | Amt. Paid | Rendering Provider NPICS Name | Billing Provider NPICS Name | Plan |
|------|------|------------------|-----------|-------------------------------|-----------------------------|------|
| 6/12/2019 | 90834 | Psychotherapy, 45 minutes | $77.00 | | Bruining | NHPRI OPTUM |
| 6/19/2019 | 90834 | Psychotherapy, 45 minutes | $77.00 | | Bruining | NHPRI OPTUM |
| 7/11/2019 | 90834 | Psychotherapy, 45 minutes | $77.00 | | Bruining | NHPRI OPTUM |
| 7/18/2019 | 90834 | Psychotherapy, 45 minutes | $77.00 | | Bruining | NHPRI OPTUM |
| 8/1/2019 | 90834 | Psychotherapy, 45 minutes | $77.00 | | Bruining | NHPRI OPTUM |
| 8/31/2019 | 90834 | Psychotherapy, 45 minutes | $77.00 | | Bruining | NHPRI OPTUM |
| 9/7/2019 | 90834 | Psychotherapy, 45 minutes | $77.00 | | Bruining | NHPRI OPTUM |
| 9/21/2019 | 90834 | Psychotherapy, 45 minutes | $77.00 | | Bruining | NHPRI OPTUM |
| 10/5/2019 | 90834 | Psychotherapy, 45 minutes | $77.00 | | Bruining | NHPRI OPTUM |
| 10/19/2019 | 90834 | Psychotherapy, 45 minutes | $77.00 | | Bruining | NHPRI OPTUM |
| 10/16/2021 | 90834 | Psychotherapy, 45 minutes | $52.72 | Mi Ok Bruining | Mi Ok Bruining | UHC |
| 12/11/2021 | 90834 | Psychotherapy, 45 minutes | $52.72 | Mi Ok Bruining | Mi Ok Bruining | UHC |
| 1/22/2022 | 90834 | Psychotherapy, 45 minutes | $51.72 | Bruining, Mi Ok | Recovery Connection | UHC |
| 6/24/2022 | 90834 | Psychotherapy, 45 minutes | $68.30 | | Bruining | NHPRI OPTUM |
| 7/28/2022 | 90834 | Psychotherapy, 45 minutes | $68.30 | | Bruining | NHPRI OPTUM |
| 10/7/2022 | 90834 | Psychotherapy, 45 minutes | $68.30 | | Bruining | NHPRI OPTUM |

86. Although the claims are identified as being billed by Bruining, the payment for the claim was made to RCCA because the services were billed under RCCA's TIN.

## Patient F

87. On June 1, 2022, agents interviewed RCCA Patient F, who receives treatment at the Taunton location. Patient F reported in substance the following, among other things:

    a. Patient F has been a patient at RCCA since May 2021;

      b.   Patient F estimates that he/she has consistently spent no more than 15 minutes with the RCCA counselor per visit.

88.    The claims submitted by RCCA for Patient F show that between May 5, 2021, and November 9, 2022, RCCA billed code 90834 for 45-minute counseling visits 29 times and was paid a total of $1,834.09 for these claims. The following table is an example of ten claims for counseling services billed to Medicare by RCCA for Patient F:

| Date | Code | Code Description | Amt. Paid | Rendering Provider NPICS Name | Billing Provider NPICS Name | Plan |
|------|------|------------------|-----------|-------------------------------|-----------------------------|------|
| 5/5/2021 | 90834 | Psychotherapy, 45 minutes | $63.70 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 5/12/2021 | 90834 | Psychotherapy, 45 minutes | $63.70 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 8/24/2021 | 90834 | Psychotherapy, 45 minutes | $63.70 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 9/14/2021 | 90834 | Psychotherapy, 45 minutes | $63.70 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 12/1/2021 | 90834 | Psychotherapy, 45 minutes | $63.70 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 1/12/2022 | 90834 | Psychotherapy, 45 minutes | $63.39 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 5/4/2022 | 90834 | Psychotherapy, 45 minutes | $62.76 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 6/29/2022 | 90834 | Psychotherapy, 45 minutes | $62.76 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 8/31/2022 | 90834 | Psychotherapy, 45 minutes | $62.12 | Bruining, Mi Ok | Recovery Connection | Medicare |
| 10/122022 | 90834 | Psychotherapy, 45 minutes | $62.12 | Bruining, Mi Ok | Recovery Connection | Medicare |

89.    The other 19 claims billed to Medicare for Patient F are nearly identical to the examples above.

**E.    Brier's Knowledge of Billing for Counseling at RCCA**

90.    Former Employee #4 also provided a November 8, 2019, email exchange between FE # 4, Bruining, and Brier which makes clear that Bruining and Brier were well aware that RCCA was billing for 45-minute counseling sessions that were only lasting at most 15 minutes, as follows:

91.    On or about Friday, November 8, 2019, FE #4 wrote in an email to Bruining:

I have a question about the scheduling of clients. I'm putting clients on my schedule in 45 minute increments per your instructions. My notes have a start time but don't specify the amount of time I saw the client. The start time doesn't match the time I actually see the client. I guess I'm concerned that the clients might be being billed for 45 minutes of time but clearly I'm not seeing 14 clients for 45 minutes during a 4 and 1/2 hour shift…. Do the insurance companies know clients aren't being seen for 45 minutes? Is it just a set price for having the clients seen?….. I just want to make sure this is all on the up and up. I don't want to accidentally participate in fraud (and to be clear I am NOT accusing anyone of fraud) Maybe we should change to 15 minute incremental notes to better reflect the time I am spending with clients. The insurance company would understand 15 minutes as the smallest billable increment. Unless they have already agreed to pay 45 minutes per contact. So I'm wondering if you could explain this to me a little better why we do this the way we do it.

92.    On the same day, approximately 30 minutes later, Bruining responds to FE #4 and

wrote, in part:

Good questions and concern re: billing and time seen for counseling with clients. The insurance companies reimburse Recovery Connection (RC) bill for 45 minute clinical (counseling) increments (regardless of whether the sessions are 15 minutes or 1 hour), so we bill as 45 minutes. Due to the recent new billing department (at Recovery Connection) learning how to bill for reimbursement from insurance companies, I have had to download over 100 SOAP notes (where I then put in the start time and end time in 45 minute increments), then give them to Michael to fax over to the insurance companies. We leave the end time off of SOAP notes in Practice Fusion, unless insurance companies audit for our SOAP notes.

93.    On Saturday November 9, 2019, FE #4 responded to Bruining by email, in part:

Thank you for exploring. So if I understand it right the insurance companies understand that most sessions are about 15 minutes long but will be longer based on clients' needs. If they look at my numbers I average about 4 an hour, maybe slightly more than that but never a lot more and for 8 hour shifts it's always been less than 4 an hour so that shouldn't be a problem. But they don't think that I'm actually seeing each client for 45 minutes. They understand we are billing for 45 minutes as our smallest clinical unit. Is that correct? With that understanding, if they did get notes with start times 15 minutes apart would we still be able to bill for 45 minutes? Do the notes need to be 45 minutes apart to bill for 45 minutes? This will be good for me to know when I start my private practice in a few years. Because I am creating two contradictory documents. My emails/texts to Michael which say my hours worked for example Saturday 9 to 1, and notes that say I saw

clients at 3, 345, 430, 515, and 6. None of which fall within my work shift. The insurance companies aren't going to look at my schedule but I could foresee emails and schedules being court ordered if there was ever a client suicide and the families thought they should have been assessed. There's going to be a depression screening that has never been changed from the first client meeting and a start time for an appointment that didn't fall within my work shift.

94.    That same day, Bruining responded to FE #4's email, this time adding

Brier to the email chain.  Bruining's response reads, in part:

I don't mind you asking questions, seeking clarification and verbalizing your concerns. That said, the insurance companies will NOT be checking your Practice Fusion schedule which means they don't know what time you started your shifts, nor when you actually saw the clients at what times. Please do not schedule clients 15 minutes apart. Please do not fix something that ain't broke. This system works for both Michael and me, please do not change it. Your two "contradictory documents (time sheet to Michael and SOAP notes)" are irrelevant to insurance companies, billing and reimbursements (except to you as an issue), when you email your weekly time sheet to Michael and you upload your daily SOAP notes in Practice Fusion. The current system of scheduling of clients on the Practice Fusion schedule is for Michael to identify which clients to bill for. …

Insurance billing and reimbursement has nothing to do with what you are doing, which is to do the following: 1.  Schedule clients with 45 minute slots 2. See clients for counseling 3.  Write the SOAP notes 4.  Upload the notes …

Please leave the insurance billing and reimbursements to Michael and his billing team.

95.    Finally, Brier responded to Bruining's email later in the day on November

9, 2019 and told FE #4 and Bruining, in part:

Forgive me but I don't feel like reading all these emails. If you don't feel comfortable, I don't care don't put any time into the notes is fine! If you ever noticed the time function doesn't work in PF for either BH or Medical. The best I can get is a check in time but no departure times. We use 45 minutes just because it is better to use more than less time as an estimate of time. As for billing and coding I don't know why either of you are discussing. I pay a certified coder and biller to handle this for us. Sometimes, we bill 30 minutes and sometimes 45. Don't forget documentation time counts also. …

96.     However, a year later, in a response to an inquiry from Blue Cross Blue Shield of Rhode Island ("BCBSRI"), Brier falsely stated that the counseling sessions at RCCA routinely lasted at least 45 minutes.

97.     In its original March 20, 2020, inquiry letter, BCBSRI advised that the program had concerns about a number of issues relating to claims submitted or referred by RCCA, including the billing of all counseling services for 45 minutes, without variety or individualization within patient notes reviewed by BCBSRI.  Notably, the letter from BCBSRI references a previous communication from Brier, in April 2018, in which Brier advised BCBSRI that he was the office manager for RCCA.  The letter from BCBSRI also included a Corrective Action Plan, which directed RCCA that "counseling should be individualized and varied" and that to correct the issue, RCCA should "code the correct level based on services/time actually provided" to patients.

98.     In a letter dated April 8, 2020, Brier, among other things, responded to BCBSRI's specific concern about RCCA's billing of code 90834 for all patients, Brier stated the following:

> It appears that 90834 is the "middle" CPT code under the BCBSRI guidelines [sic] Many times, RCCA's counselors find that they must routinely provide a minimum of 45 minutes of counseling to their patients and, in fact, find it very difficult to limit a counseling session to 45 minutes in light of the complications and behavioral health issues that RCCA's patients are suffering…..A review of 90837 indicates that it would be a higher billing code. RCCA has never billed for that long of a session, regardless of the actual time spent by the counselor.  The counselor cannot limit RCCA's patients to less than 45 minutes in light of the disease they have, the other co-conditions and complications they suffer, and the infrequency of their visits. RCCA will continue to spend the necessary amount of time with its patients, regardless of whether or not BCBSRI ultimately pays the amount for a lesser code.

99.     At the conclusion of this response to BCBSRI, Brier indicated that RCCA has already begun to implement changes indicated by BCBSRI's Corrective Action Plan and that he

has signed the plan.  Specifically, Brier indicated that RCCA would code counseling services at the "correct level based on the services/time actually provided" to the patient.  However, RCCA continued to bill BCBSRI for counseling sessions almost exclusively as 45 minutes or more from 2020 through at least February 1, 2023.

## IV.    BRIER'S USE OF THE IDENTIFIERS OF DOCTORS WITHOUT THEIR PERMISSION OR THE AUTHORITY TO WRITE PRESCRIPTIONS

100.    During this investigation, agents also spoke to a physician, Dr. #1, and former employee of RCCA, who reported that Brier used their prescription writing authority to write prescriptions without their authority.  In doing so, Brier used their personally identifying PIN and DEA number.  It also appears that Brier practices medicine without any medical license to do so and by deceiving the patients into believing that he is a doctor, when he is not.

101.    Dr. #1 reported in substance the following, among other things:

a.    He/She is a licensed physician who worked at RCCA in Massachusetts from June 2018 through approximately early September 2020.  Some of this time Dr. #1 worked remotely due to COVID-19.  At first, Dr. #1 worked four hours one day a week, and then later worked eight hours per week over two days.

b.    Dr. #1 was let go from RCCA by Brier because they "disagreed on things."  Dr. #1 did not like how Brier ran things at RCCA.

c.    Dr. #1 understood that Brier owns RCCA and that Brier was in charge of everything at RCCA because he handled everything, including billing and human resources-related issues.  Everyone at RCCA answered to Brier.  Dr. #1 understood that Dr. #2 reported to Brier.

d.    In December 2018, Dr. #1 received approval from Brier to be out for a three-week cruise.  When he/she returned, the RCCA office manager told Dr. #1 that there were days when there was no physician to see patients in the Attleboro location and that Brier had filled in for Dr. #1, including issuing Suboxone prescriptions to patients on his own.

e.    Dr. #1 was angry about this and communicated with Brier by email about this.

102.   Dr. #1 later forwarded an email chain in which Brier confirmed that he had been signing prescriptions with his/her name for a least one full afternoon shift.  In that email exchange, Brier wrote, among other things:

> Originally, I planned to have our new NP take over that Wednesday. Unfortunately, that was not possible since she requires a supervising physician in Mass and having researched it I see no reason for any of our providers to risk their license on someone else's work.   … Faced with the holidays, I made the decision that I would meet with the patients and give them all a prescription to hold them over till you came back.  At the last second, I found out that you would not be coming back on Friday as you had told me.  … At that point I decided to again meet with any other patients the following week. ….
> 1. First and MOST IMPORTANT WE DID NOT BILL FOR ANY OF THE PATIENT VISITS.
> 2. Second, I wanted to see how the office operated both on the medical side and behavioral health side.   … I need to have a comfort level that my providers are treating our patients with concern and patience….
> 3. Lastly, irregardless we needed to fill these patients' prescriptions. It is the same as a snow day. … We have patients of all our doctors who miss appointments and our position is that we will give them a script if they do a urine test and if they don't do a urine test then their labs must be clean. … None of this has even been an issue in 2 ½ years of operation and this is by far not the first time we have been without a doctor.  That is why we do NOT submit the invoices.

103.   Dr. #1's response, among other things, stated, "I have to disagree that "most important thing is that we did not bill" for the patients [sic].  That is far from my greatest concerns."  Dr. #1 also stated, in the email to Brier, "it is against the law for a layperson to practice medicine, and that is actually what you were doing, even though you may not realize it."

104.   In that email response to Brier, Dr. #1 also wrote:

> The patients did not realize that you were not a physician, and many referred to you as one.  I think you know this.  You gave them prescriptions with my signature, or a proxy for it.  The records are written as if I wrote them. …. You were seeing patients in a provider role – including brand- new patients, and prescribing controlled substances that even MD's without waivered licenses are not allowed to do.  Even an MD who gave a patient Suboxone prescription without having a DEA X number would likely lose his/her medical license for at least a period of time and be seriously disciplined by the Board of Registration of Medicine.

105.   Dr. #1 received no response to this email.

106.   Agents matched the travel history from U.S. Customs and Border Protection for Dr. #1 with the prescriptions written using Dr. #1's DEA number for the time period during which he/she was on vacation, from December 18, 2018, and returning January 4, 2019.  55 suboxone/buprenorphine prescriptions were written between December 23, 2018, and January 3, 2019, using Dr. #1's DEA number and filled by pharmacies in Massachusetts.  An additional two suboxone/buprenorphine prescriptions were written on December 26, 2018, and January 2, 2019, using Dr. #1's DEA number and filled by a pharmacy in Central Falls, RI:

| Initial | Fill Date | Written Date | Drug Name | Qty | Supply | Store ID | Rx # | Pymt Type |
|---------|-----------|--------------|-----------|-----|--------|----------|------|-----------|
| Patient G. | 01/03/2019 | 01/02/2019 | SUBOXONE 8 MG-2MG SL FILM | 14 | 7 | RHOD17XX | 000832XXXX | Medicaid |
| Patient G | 12/26/2018 | 12/26/2018 | SUBOXONE 8 MG-2MG SL FILM | 14 | 7 | RHOD17XX | 000830XXXX | Medicaid |

107.   FE #1 also reported that Brier printed and signed suboxone prescriptions for patients when a different physician, CE #6, was out of the office over several Saturdays in the Providence location.  FE #1 reported to agents that a patient texted FE #1 about the visit with Brier and showed FE #1 a picture of the suboxone prescription with the physician's signature that was signed by Brier.  CE #6 found out that Brier had issued suboxone prescriptions in CE #6's name and commented to FE #1, "It's my license."

108.   FE #1 told agents that Dr. #2 found out that Brier was "playing doctor" and told Brier to stop.  Dr. #2 also began issuing an additional prescription to his patients if he knew he would be out of the office in order to prevent Brier from issuing suboxone prescriptions in Dr. #2's name.

## V.    BRIER'S ATTEMPT TO OBSTRUCT THE INVESTIGATION

### Statements by Dr. #2

109.    On or about February 3, 2023, agents interviewed Dr. #2, who reported the following, in substance:

    a.  Dr. #2 began working for RCCA part time in March 2017 as a physician seeing patients for medical visits.  Dr. #2 became a full-time employee in January 2022, when he/she became the co-Medical Director and President of RCCA. Despite the titles, Dr. #2 does not perform a managerial role for RCCA. He/she has continued to see patients for medical visits two days per week.

    b.  RCCA was already in operation at the time he/she was originally hired in 2017.

    c.  Twice in the last two years, Dr. #2 was asked by Brier to go to Bank of America and sign documents at the bank.  Dr. #2 told agents that he/she does not know what he/she was signing and has not been provided with a copy of the documents, despite repeatedly asking Brier for a copy.  Dr. #2 told the agents at the time of the interview, "To this day I don't know what I signed." When Dr. #2 asked Brier why he/she had to sign the documents at Bank of America, Brier told Dr. #2 that it was "in case we need easy money."

    d.  Dr. #2 is aware that Brier has used Dr. #2's name as President of RCCA but does not know how long Brier has been using Dr. #2's name in this way.  When Dr. #2 spoke with Brier about this, saying, "Mike, I'm getting tired of doing this," Brier made Dr. #2 a full-time employee and gave Dr. #2 a significant increase in salary. When Brier made Dr. #2 the President of RCCA, Brier made it clear to Dr. #2 that it was Brier who had 100% control of RCCA, regardless of Dr. #2's title.

    e.  It is Dr. #2's understanding that Brier wanted to use Dr. #2's name on documents because Brier had been previously charged with a federal crime and had served time in prison.

110.    On February 8, 2023, Dr. #2 provided the following additional information to this affiant:

    a.  Within an hour or two of being interviewed by agents on February 3, 2023, Dr. #2 told Brier what he/she had said during the interview, including that Brier had been using Dr. #2's name on documents.  Brier told Dr. #2, "You should have kept your mouth shut."

    b.  On February 8, 2023, Brier approached Dr. #2 in between seeing patients at the Providence location and told Dr. #2 that he [Brier] had a document he wanted Dr. #2 to sign. This document read that Dr. #2 gave Brier permission to use Dr. #2's name on various documents, including financial documents, documents relating to

RCCA's laboratory, and government contracts. This document was back dated to 2018.

    c.   Dr. #2 initially refused to sign this document and refused again when Brier asked Dr. #2 twice more to sign it. Dr. #2 told this affiant that Dr. #2 did eventually sign this document because he/she felt scared and threatened by Brier to do so. He/she further told the affiant that the interaction with Brier made Dr. #2 "sick," that he/she signed the document under duress, and that he/she regretted signing the document. Despite asking Brier for a copy of the document, Brier did not provide a copy to Dr. #2.

    d.   Later the same day, when he/she got home, Dr. #2 sent an instant message chat to Brier, again asking for a copy of the document he/she signed. Brier responded, "First I want to know what you said to the FBI."

111.   On February 14, 2023, Manager #1 also made the following statements, in substance, among others:

    a.   Manager #1 was working in the Providence location on February 8, 2023. Manager #1's office is directly above the examination room where the RCCA medical providers see patients. Manager #1 overheard a conversation between Brier and Dr. #2 that occurred around 1pm/1:30pm. Although Manager #1 could not hear the substance of the conversation, he/she recognized Brier's voice because he was speaking very loudly. He/she did not hear Dr. #2 yelling in response.

    b.   Manager #1 did not see Brier but saw Dr. #2 around 2pm. He/she told agents that Dr. #2 was shaking and could not speak in complete sentences. When Dr. #2 was able to speak, Dr. #2 told Manager #1 that Brier had just come into Dr. #2's office and made Dr. #2 sign a document. Manager #1's understanding of this document was that it dated back to 2018 and gave Brier permission to sign documents with Dr. #2's name.

    c.   On the same day, February 8, 2023, Manager #1 spoke with another member of the RCCA Executive Team ("CE # 7"), who told Manager #1 that he/she had spoken with Brier, who had admitted that he had been signing Dr. #2's name on documents.

## VI.    MONEY LAUNDERING, SEIZURES, AND FORFEITABILITY OF REAL PROPERTIES

112.    For the reasons set forth above, there is probable cause to believe that proceeds from RCCA, Brier, and Bruining's activities are proceeds of a specified unlawful activity, namely healthcare fraud under 18 U.S.C. §1956(c)(7)(F).  Based on the above, there is also probable cause to believe RCCA, Brier, and Bruining knew that those proceeds were criminally derived.  As set forth below, Brier, and thereby RCCA, conducted or attempted to conduct financial transactions, with proceeds that Brier knew were from the healthcare fraud, for the purpose of concealing the nature, source, location, ownership, or control of those proceeds, in violation of 18 U.S.C. §1956(a)(1)(B)(i).  As set forth below, Brier, and thereby RCCA, with proceeds from the healthcare fraud exceeding $10,000, engaged in monetary transactions involving financial institutions, in violation of 18 U.S.C. §§ 1956 and 1957.  Furthermore, based on the money movement and associated and resulting concealment or attempted concealment, the target accounts, target vehicles, and target properties are all involved in money laundering and therefore subject to forfeiture.

113.    Funds from specified unlawful activities pursuant to 18 U.S.C. § 1956(c)(7)(F) were deposited into Target Account #1.  From account records, I know that those funds were then utilized to purchase assets, which constituted concealment or attempted concealment of Brier's income from illegally obtained proceeds.  Furthermore, I have probable cause to believe that funds from Target Account 1, were transferred to Target Accounts 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12 and 13, which are all controlled by Brier and/or Brier Relation #1, in an attempt to conceal money and purchase assets in another name.  These deposits and transfers constitute both concealment and commingling, and thereby the accounts are all involved in money laundering.

114.    A review of Target Account 1 reveals total deposits of $15,200,616.65 between

January 2019 to May 2022.  The largest deposits into account 0760 are listed below:

>United Behavior Health (UBH) $2,412,686,87,
>Commonwealth of Massachusetts $1,926,284.01,
>United HealthCare (UHC) $1,795,799.41,
>National Government Services (NGS, Inc) $1,734,838.11,
>Boston $1,365,222.14,
>Beacon $1,158,844.64,
>Blue Cross Blue Shield (BCBS) $955,253.74,
>Transfer from Target Account #4 $661,900.00,
>SBA $499,900.00,
>Tufts $437,286.50,
>NHPRI $376,493.12, and
>FHC Health $278,555.79.

115.    A review of Target Account 1 revealed total debits from the account as

$15,152,733.48 from January 2019 to May 2022.  Selected debits from Target Account #1 are

highlighted below:

| | |
|---|---|
| Miscellaneous Transfer from Target Account 1 | $670,244.16 |
| Transfer to Target Account 2 | $42,300.00 |
| Transfer to Target Account 3 | $202,000.00 |
| Transfer to Target Account 4 | $681,305.00 |
| Transfer to Target Account 7 | $130,000.00 |
| Transfer to Target Account 8 | $203,000.00 |
| Transfer to Target Account 9 | $100,000.00 |
| Transfer to Target Account 10 | $48,739.00 |
| Transfer to Target Account 13 | $165,816.41 |
| Transfer to Santander | $102,686.32 |
| Transfer to Credit Card | $663,084.28 |
| Transfer to Michael Brier | $263,835.88 |
| Transfer to Misc check | $421,621.18 |
| Transfer to Misc Debit | $1,002,909.99 |
| Transfer to Brier Relation #1 | $246,000.00 |
| Transfer to Playa Escondida Beachfront | $48.480.00 |
| Transfer to Mega Events | $113,157.00 |
| Transfer to Duckham Architecture & Interiors | $33,346.46 |

116.    On June 7, 2020, $5,000 was transferred from Target Account 1 to Playa

Escondida Beachfront, Calle 56 Paitilla, Panama.  The originators name is listed as "Recovery

Connection of Amer." On August 24, 2020, an international wire transfer was conducted from Target Account 1 to Playa Escondida Beachfront, Calle 56 Paitilla, Panama for $19,240, transaction number 00050344. On November 16, 2020, an international wire transfer was conducted from Target Account 1 to Playa Escondida Beachfront, Calle 56 Paitilla, Panama for $24,240, transaction number 00068869.

117.    On May 25, 2020, $6,500 was transferred from Target Account #1 to Target Account 2. On June 4, 2020, $25,000 was transferred from Target Account 1 to Target Account 2, and on June 5, 2020, a $24,999.22 payment was made to Great Lakes Student Loans from Target account 2. On June 22, 2020, $6,000 was transferred from Target Account 1 to Target Account 2.

118.    On July 14, 2020, $43,000 was transferred from Target Account 1 to Target Account 3. On July 14, 2020, $41,856.81 was withdrawn from Target Account 3 to purchase Bank of America cashier's check # 1442509727, drawn on Target account 3, dated July 14, 2020, in the amount of $41,856.81, payable to Boch Honda West. On July 31, 2020, $59,000 was transferred from Target Account 1 to Target Account 3. On July 31, 2020, $59,242.88 was withdrawn from Target Account 3 to purchase Bank of America cashier's check # 1421911462, dated July 31, 2020, in the amount of $59,242.88, payable to Mercedes-Benz Burlington.

119.    On August 13, 2020, $15,000 was transferred from Target Account 1 to Target Account 3. On August 13, 2020, $15,000 was transferred from Target Account 3 to "Interactive Brokers." On September 17, 2020, $40,000 was transferred from Target Account 1 to Target Account 3. On September 18, 2020, $40,000 was transferred from Target Account 3 to "Interactive Brokers." On September 21, 2020, $45,000 was transferred from Target Account 1

to Target Account 3. On September 21, 2020, $45,000 was transferred from Target Account 3 to "Interactive Brokers"

120. On June 11, 2021, an international wire transfer was conducted from Target Account 4 to Playa Escondida Beachfront, Calle 56 Paitilla, Panama for $24,260, transaction number 00208828. The Originators name is listed as Barrington Urgent Care, PC. On July 29, 2021, an international wire transfer was conducted from Target Account 4 to Playa Escondida Beachfront, Calle 56 Paitilla, Panama for $24,240, transaction number 00365429. The Originators name is listed as Barrington Urgent Care, PC.

121. Target Account 4 is listed as Barrington Urgent Care, PC (BUC). BUC was closed several years ago and purchased by Ocean State Urgent Care. The most recent health care payment deposited into Target Account 4 was made by Beacon Health on May 10, 2022, for $86.37. Of a total of $1,404,432.87 deposited into Target Account 4 since it was opened, $681,305 was transferred from Target Account 1, and an additional $438,782.14 was deposited by various health insurance payors, including Medicare.

122. On December 13, 2021, $500,000 was transferred from Target Account 1 to Target Account 4. On January 11, 2022, $100,000 was transferred from Target Account 1 to Target Account 4. On January 24, 2022, $15,000 was transferred from Target Account 1 to Target Account 4. On February 18, 2022, $50,000 was transferred from Target Account 1 to Target Account 4. On May 19, 2022, $10,000 was transferred from Target Account 1 to Target Account 4.

123. A review of a Target Account 5 reveals checks drawn on Target Account 1 and deposited to Target Account 5, as well as transfers from Target Account 1 to Target Account 5. These transfers constitute concealment and result in commingling, and Account 5 is thereby

involved in money laundering. The payee is listed as [Brier Relation #1] and several memo lines

on the checks are listed as "Providence Rent." The below chart details those payments for a total

of $224,400:

| Date | Debit |
|------|-------|
| 1/10/19 | $ (2,400.00) |
| 2/7/19 | $ (2,400.00) |
| 2/28/19 | $ (4,800.00) |
| 3/25/19 | $ 4,800.00) |
| 4/1/19 | $ (2,800.00) |
| 4/1/19 | $ (2,400.00) |
| 5/2/19 | $ (2,800.00) |
| 6/3/19 | $ (2,800.00) |
| 7/1/19 | $ (2,800.00) |
| 8/1/19 | $ (2,800.00) |
| 11/27/19 | $ (4,800.00) |
| 11/27/19 | $ (2,800.00) |
| 12/13/19 | $ (4,800.00) |
| 12/27/19 | $ (4,800.00) |
| 1/2/20 | $ 4,800.00) |
| 2/4/20 | $ (4,800.00) |
| 3/20/20 | $ 4,800.00) |
| 4/2/20 | $ 2,800.00) |
| 5/20/20 | $ (4,800.00) |
| 5/20/20 | $ (2,000.00) |
| 6/1/20 | $ (4,800.00) |
| 7/2/20 | $ (4,800.00) |
| 8/6/20 | $ (4,800.00) |
| 9/11/20 | $ (4,800.00) |
| 10/6/20 | $ (4,800.00) |
| 11/10/20 | $ (7,200.00) |
| 11/25/20 | $ (7,200.00) |
| 2/2/21 | $ (7,200.00) |
| 2/26/21 | $ (7,200.00) |
| 5/7/21 | $ (7,200.00) |
| 7/14/21 | $ (7,200.00) |
| 7/30/21 | $ (7,200.00) |
| 8/30/21 | $ (7,200.00) |

| | |
|---|---|
| 10/1/21 | $ (7,200.00) |
| 10/29/21 | $ (7,200.00) |
| 12/2/21 | $ (7,200.00) |
| 12/31/21 | $ (8,200.00) |
| 1/26/22 | $ (8,200.00) |
| 3/9/22 | $ (8,200.00) |
| 4/7/22 | $ (8,200.00) |
| 4/27/22 | $ (8,200.00) |
| 5/31/22 | $ (8,200.00) |

124.    A review of records for Target Account 5 reveals a total of $224,400 was transferred from Target Account 1 to Target Account 5 from January 10, 2019, to May 31, 2022. On October 11, 2019, a check totaling $4,000, made payable to [Brier Relation #1], drawn on Target Account 2 was deposited into Target Account 5.

125.    Target Account 6 was opened on September 18, 2020, and $82,000 was transferred into Target Account 6 from Target Account 5.  This transfer again constitutes further concealment and results in commingling, and Target Account 6 is thereby involved in money laundering.

126.    Between January 5, 2021, and August 26, 2022, $122,050 was transferred from Target Account 5 into Target Account 12 via 19 deposits.  A review of Target Account 6 reveals three transfers that total $32,000 from Target Account 6 into Target Account 5; those funds were later transferred to Target Account 12.  These transfers again constitute further concealment and result in commingling, and Target Accounts 5 and 12 are thereby involved in money laundering.

127.    A review of Target Account 7 reveals a check deposit of $70,000, check number 1290 issued from Target Account 1 and deposited into Target Account 7.  In addition, between January 19, 2022, and May 25, 2022, five transfers totaling $60,000 were transferred into Target Account 7 from Target Account 1.

128.    A review of Target Account 8 reveals thirteen transactions between March 7, 2022, and May 25, 2022.  A total of $203,000 was transferred from Target Account 1 to Target Account 8.

129.    A review of Target Account 9 reveals one transaction dated September 17, 2020. A total of $100,000 was transferred from Target Account 1 to Target Account 9.

130.    Target Account 10 is a Vanguard Investment Account, number xxxx7970 in the name of Michael Brier.  On April 27, 2021, $48,739.00 was transferred from Target Account 1 to Target Account 10.

131.    Target Account 11 is a Vanguard Roth brokerage account, number xxxx4187 in the name of Michael Brier.  On June 22, 2020, $6,000 was transferred from Target Account 1 to Target Account 2.  On June 23, 2020, $6,900 was transferred from Target Account 2 to Target Account 11.  These transfers again constitute further concealment and result in commingling, and Target Accounts 11 is thereby involved in money laundering.

132.    On January 11, 2021, Brier named Brier Relation #1 of 29 Kenilworth Street, Newton, MA as his trusted contact for Target Accounts 10 and 11.  On February 16, 2021, Brier links Target Account 1 to Target Accounts 10 and 11.

133.    Target Account 12 is a John Hancock USA 401(k) retirement plan for Recovery Connection Center, contract account XX0593, which was opened by Brier on May 15, 2019. Michael Brier is a participant in that plan, along with six other RCCA employees.  A review of Target Account 1 shows ten transfers from January 16, 2020, to May 5, 2022, totaling $163,543.69 from Target Account 1 to Target Account 13.  On January 16, 2020, $7,727.28 was transferred from Target Account 1 to participant Michael Brier's account in Target account 13. On January 24, 2020, $15,000 was transferred from Target Account 1 to participant Michael

Brier's account in Target Account 13. On June 24, 2020, $27,541.00 was transferred from Target Account 1 to participant Michael Brier's account in Target Account 13. On June 5, 2020, $26,000 was transferred from Target Account 1 to participant Michael Brier's account in Target Account 13. Of the $163,543.69 transferred from Target Account 1 to Target Account 13, $149,641, or 91%, was deposited into participant Michael Brier's account.

134. Target Property 1 has a listed owner of [Brier Relation #1]. Target Property 1 is the location for RCCA headquarters and the location of the largest RCCA facility. Records reveal Michael Brier was the previous owner and obtained a mortgage loan for Target Property 1 on March 1, 1988. Records reveal an Assignment of Mortgage recorded May 5, 2020 for property address of Target Property 1. It states, "DITECH Financial LLC, grants, sells, assigned and conveys thereon to New Residential Mortgage LLC, all beneficial interest regarding the original loan in the amount of $197,000 obtained by Michael S. Brier on March 1, 1988 from Citicorp Mortgage." On September 22, 2020, the New Residential Mortgage LLC loan was transferred to Federal National Mortgage Association.

135. A review of Target Account 5 reveals monthly payments to the Ditech and later Newrez, c/o Shellpoint for Target Property 1 in the name of Michael Brier. Examples of those payments include: 1) A check issued from Target Account 5, dated 12/31/2022, in the amount $2,072, made payable to Newrez LLC c/o Shellpoint, check number 298; 2) A check issued from Target Account 5, dated 10/28/2022, in the amount $2,100, made payable to Newrez LLC c/o Shellpoint, check number 297; 3) A check issued from Target Account 5, dated 10/01/2022, in the amount $2,073, made payable to Newrez LLC c/o Shellpoint Mortgage, check number 296; 4) A check issued from Target Account 5, dated 3/1/2019, in the amount $2046.62, made payable to Ditech, check number 250; 5) A check issued from Target Account 5, dated 2/1/2019,

in the amount $2046.62, made payable to Ditech, check number 249; and 6) A check issued from Target Account 5, dated 12/27/2016, in the amount $1,638.31, made payable to Ditech, check number 176. This movement of funds from Target Account 5 to Target Property 1 constitutes concealment and makes Target Property 1 involved in money laundering.

136.    Corporation records for the state of Rhode Island reveal the Wickenden Business District, incorporated 3/16/2005 with a registered agent of Michael Brier and registered agent address of 381 Wickenden Street, Providence, RI. Status is Revoked Entity.

137.    Corporation records for the state of Rhode Island reveal Second Chances, 381 Wickenden Street, Providence, incorporated 4/14/2012 with a registered agent of Michael Brier and registered agent address of 381 Wickenden Street, Providence, RI. Status is Dissolved.

138.    Corporation records for the state of Rhode Island reveal Second Chances, 381 Wickenden Street, Providence, incorporated 4/14/2012 with a registered agent of Michael Brier and registered agent address of 381 Wickenden Street, Providence, RI. Status is Dissolved.

139.    Corporation records check for the state of Rhode Island reveal Recovery Connection Centers Inc, incorporated 6/27/2016 with a registered agent of Michael Brier and registered agent address of 381 Wickenden Street, Providence, RI. Status is Dissolved.

140.    A review of Target Account 5 reveals payments to the city of Newton, MA. Examples of those payments include, a check issued from Target Account 5 dated 1/15/2019, in the amount $2,500, made payable to the City of Newton, check number 251. An ID number written on the check was 730100001600. The MA assessor's office lists parcel number 730100001600 as 29 Kenilworth Street, Newton, MA. A check issued from Target Account 5 dated 5/27/2020, in the amount $12,725, to the City of Newton, check number 253. Written on

the check was Parcel # 730100001600.  The MA assessor's office lists parcel number 730100001600 as 29 Kenilworth Street, Newton, MA.

141.    On April 26, 2022, at approximately 12:47 pm, a physical surveillance was conducted by Agents of the FBI.  Michael Brier was observed arriving at 381 Wickenden Street, Providence, RI driving a black Lexus (Target Vehicle 1) bearing MA license plate 3MRM51.

142.    On May 3, 2022, at approximately 8:00 am, a physical surveillance was conducted by Agents of the FBI at 29 Kenilworth Street, Newton, MA.  Agents observed a gray Mercedes (Target Vehicle 2) bearing MA license plate 2MMF74 and Lexus bearing MA license plate 3MRM51 in the driveway at 29 Kenilworth Street, Newton, MA.  At approximately 8:09 am, Brier was observed opening the trunk to the Lexus and returning to the residence.

143.    On May 24, 2022, at approximately 7:50 a physical surveillance was conducted at 29 Kenilworth Street, Newton, MA by Agents of the FBI, observed was a gray Mercedes parked in the back of the driveway at 29 Kenilworth Street, Newton, MA.

144.    On July 20, 2022, a physical surveillance was conducted by Agents of the FBI at 29 Kenilworth Street, Newton, MA.  At approximately 7:45 am a gray Mercedes bearing MA license plate 2MMF74 and black colored Lexus bearing MA license plate 3MRM51 in the driveway at 29 Kenilworth Street, Newton, MA, respectively Target Vehicles 1 and 2.  At approximately 10:50 am, the Lexus departed the residence and Brier was observed as the driver of the vehicle.

145.    A review of Target Account 1 revealed thirteen checks drawn on Target Account 1, made payable to Duckham Architecture and Interiors, totaling $33,346.46 from 10/26/20 to 2/1/22.  Duckham Architecture and Interiors is a Needham, MA based firm specializing in custom home interiors.  An inquiry with the City of Newton, MA, Inspectional Services website

reveals Building Permit application BP-21-1668 was filed for 29 Kenilworth Street, Newton, MA on April 15, 2021, by Brier Relation #1, for "demolition of garage and construction of addition to the back of the house with garage below and living area above on the 1st floor."  The architectural plans submitted with the permit were drawn by Duckham Architecture and Interiors.  The estimated cost for the project is listed as $170,000.  The movement of proceeds from Target Account 1 to Target Property 2 constitutes further concealment and makes Target Property 2 involved in money laundering.

146.    On February 23, 2023, the agents interviewed the owner of Duckham Architecture and Interiors, who stated that the firm provided building plans for Michael and Brier Relation #1 for an addition to the back of their residence.  The owner identified the location of the planned renovation as the Brier's residence, 29 Kenilworth Street, Newton, MA.  Initial discussions with Michael Brier began around July 2020 and were finalized in October 2020. The owner of Duckham Architecture and Interiors confirmed that he/she had been paid in full by Brier and there was no outstanding balance.

147.    A review of Target Account 1 reveals $133,627.12 in payments to Home Depot from May 10, 2021, to May 24, 2022, from Target Account 1.

148.    Records subpoenaed from the Rhode Island Department of Labor and Training reveal an Unemployment Insurance claim was filed in the name of Michael Brier on or about 4/16/20.  The claimant used the online application process to apply and applied from a device accessing the internet through Internet Protocol (IP) address 73.114.199.119.  The applicant provided a mailing address of 381 Wickenden Street, Providence, RI and email address ███████@cox.net.  The claimant represented that he was employed as contract manager for

Recovery Connection, 381 Wickenden Street, Providence, RI, from November 1, 2018, to March 20, 2020.  Two payments for this claim were deposited into Target Account 4.

149.    Open-source information reveals that IP address 73.114.199.119 is held by Comcast Communications and located in West Newton, Massachusetts.

150.    Records were subpoenaed from Vanguard for records pertaining to Brier. According to Vanguard, Brier accessed his accounts online, with a username of mikebike100, approximately seventy-four (74) times from June 22, 2020, to October 21, 2021.  On January 11, 2021, Brier named [Brier Relation #1] of 29 Kenilworth Street, Newton, MA as his trusted contact for his Vanguard accounts via an online session utilizing IP address 73.114.199.119.  On April 25, 2021, IP address 73.114.199.119 was utilized to access Brier's account.  On April 27, 2021, $48,739.00 was transferred from Target Account 1 to Brier's Vanguard SEP IRA Brokerage account #XXXX7970, Target Account 10.  Based on my training and experience, I am aware that it can take several business days for funds to be withdrawn from an account and successfully transferred to a separate financial institution.  This movement of funds between target accounts from Target Property 2 results in Target Property 2 being used to facilitate money laundering, another avenue by which Target Property 2 is involved in money laundering.

151.    The real estate listed as owned by [Brier Relation #1] is being paid for from funds that originate from Target Account 1.  Brier utilizes [Brier Relation #1] as the listed owner when Brier has purchased or owned the property and continued to pay the expenses for Target Property 1 and Target Property 2.  Brier directly purchased Target Vehicles 1 and 2 with proceeds from Target Account 1, which constitutes further concealment and makes the vehicles involved in money laundering.  I further have probable cause to believe that the Target Accounts constitute

property, real or personal, involved in a transaction or attempted transaction in violation of 18

U.S.C. §§ 1956 and 1957 (money laundering of proceeds of specified unlawful activity).

152.    Accordingly, I submit that there is probable cause to seize the funds held in the

Target Accounts, Vehicles, and Properties described in Paragraph 4, as they constitute property

derived from proceeds obtained, directly or indirectly, from violations of 18 U.S.C. § 1347

(Health Care Fraud), 18 U.S.C. § 1956 (Laundering of Monetary Instruments), and 18 U.S.C.

§ 1957 (Engaging in Monetary Transactions in Property Derived From Specified Unlawful

Activity) , and therefore are subject to forfeiture pursuant to 18 U.S.C. § 982(a)(7) (criminal

forfeiture of healthcare fraud proceeds), 18 U.S.C. § 981(a)(1)(C) (civil forfeiture of healthcare

fraud proceeds), 18 U.S.C. 982(a)(1) (criminal forfeiture of money laundering proceeds), 18

U.S.C. 982(a)(1)(C) (civil forfeiture of money laundering proceeds), 18 U.S.C. § 982(a)(1)

(criminal forfeiture of property involved in money laundering), and 18 U.S.C. § 982(a)(1)(A)

(civil forfeiture of property involved in money laundering).

153.    The contents of the Target Accounts would consist of principal, deposits, interest,

dividends, and other amounts credited to the account on and after execution of the warrant up to

final liquidation of the account.  The FBI is seeking authorization, without further order of the

Court, to effect the seizure of the contents of the account by, in its discretion, directing the

financial institution at which the account is established to do any of the following:

a.    To freeze the contents of the account in place and to refuse the withdrawal

of any amount from the account by anyone other than FBI Special Agents, and while any

contents of the account are frozen in place to accrue any deposits, interest, dividends, and any

other amount credited to the account or a period of up to **sixty days** from the date of seizure and

until FBI Special Agents direct that the contents of the account be finally liquidated and no

contents remain, to ensure that payments for billing of false claims that RCCA has yet to submit, or claims early in the billing submission process for which payments have not yet been made, are captured;

        b.      To liquidate some or all of the contents of the account at one or more times at the direction of FBI Special Agents and upon any such liquidation of any contents to turn over the liquidated amount to FBI or their designee. Any such direction of FBI shall be deemed to be the direction of the Court under this warrant.

## CONCLUSION

154.   Based on the information described above, I have probable cause to believe that Michael Brier, Mi Ok Bruining, and Recovery Centers of America, Inc. on various dates, including those set forth above, did knowingly and willfully execute, or attempt to execute, a scheme to defraud a health care benefit program, and/or to obtain, by means of false or fraudulent pretenses and representations, money or property owned by, or under the custody or control of, a health care benefit program in violation of Title 18 U.S.C. § 1347 (Health Care Fraud). Michael Brier also, on various dates, did knowingly transfer, possess and use, without lawful authority, a means of identification of another person, to wit the name of Dr. #1, in violation of 18 U.S.C. § 1028A (Aggravated Identity Theft); did knowingly conceal, cover up, falsify, or make a false entry in a record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of a matter within the jurisdiction of a department or agency of the United States in violation of 18 U.S.C. § 1519 (Falsification of Records in a Federal Investigation); and did, with the intent to conceal or

disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity, conduct or attempt to conduct financial transactions involving property that represents the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity, and did knowingly engage or attempt to engage in a monetary transaction in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, in violation of Title 18 U.S.C. §§ 1956 and 1957 (Money Laundering).

155.    Additionally, I believe that there is probable cause to conclude that Michael Brier, on various dates, including those set forth above, deposited the victim proceeds into Target Account 1, commingled those proceeds with any other funds Target Account 1, and transferred such commingled funds into all of the other Target Accounts; used such commingled funds for the purchase of the Target Vehicles; used such commingled funds for mortgage payments for Target Property 1; and used such commingled funds for repair and addition to Target Property 2. Therefore, all of the target items of property are subject to forfeiture either as proceeds of healthcare fraud, money laundering, or as property involved in money laundering under 18 U.S.C. §§ 982(a)(7), 981(a)(1)(C), 982(a)(1), 982(a)(1)(C), and 982(a)(1)(A).

156.    From my consultations with assistant U.S. attorneys, I am aware that federal court decisions have defined property that is involved in a money laundering offense, and hence forfeitable under 18 U.S.C. §§ 982(a)(1) and 981(a)(1)(A), to include three categories of proceeds: (1) the proceeds of specified unlawful activity ("SUA") that were the subject of a money laundering transaction; (2) funds that were commingled with SUA proceeds at the time of the money laundering transaction; and (3) in unlawful monetary transactions, 18 U.S.C. §§ 1956 and 1957, funds that were commingled with SUA proceeds, irrespective of whether the

commingled funds were part of a money laundering transaction.  I am advised that among these decisions are United States v. Huber, 404 F.3d 1047 (8th Cir. 2005); United States v. Real Property Known as 1700 Duncanville Road, 90 F. Supp.2d 737, 741 (N.D. Tex 2000), aff'd, 250 F.3d 738 (5th Cir. 2001) (Table); United States v. One 1987 Mercedes Benz 300E, 820 F. Supp. 248, 252 (E.D. Va. 1993); and United States v. All Monies, 754 F. Supp. 1467, 1475-76 (D. Hawaii 1991).

157.    By reason of the foregoing, there is also probable cause to believe that the entirety of the funds in each of the Target Accounts, the two Target Vehicles, and the two Target Properties, were involved in unlawful monetary transactions in violation of 18 U.S.C. §§ 1956 and 1957 and are therefore forfeitable.

158.    There is also probable cause to believe that a restraining order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the Target Accounts and Target Vehicles.  I know from my training and experience that once their unlawful activities are discovered by law enforcement authorities, perpetrators of such fraud and money laundering crimes quickly encumber, transfer, or otherwise conceal their assets to avoid the seizure and forfeiture thereof, notwithstanding court orders to the contrary.  I also know from my training and conversations with other law enforcement officers that, even where banks are ordered restrained from releasing criminal proceeds in a specified account, banks cannot always guarantee error-proof compliance with such orders.  I am also aware from my training and conversations with other law enforcement officers, that restraining orders do not always prevent

banks from exercising purported rights of set-off against the restrained accounts, contrary to both

the restraining order and forfeiture laws governing third-party claimants.

Respectfully submitted,

_____

Special Agent Lindsay Walford
U.S. Department of Health and Human
Services, Office of Inspector General

Attested to by the applicant in accordance with the requirements of Fed.
R. Crim. P.  4.1 by _____**Sworn telephonically and signed electronically**___.
*(specify reliable electronic means)*

February 28, 2023
*Date*

*Judge's signature*

**Providence, Rhode Island**
*City and State*

**Patricia A. Sullivan, USMJ**
*Printed name and title*